JOHNSON & JOHNSON, A BODY CORPORATE, AND Mc-KESSON & ROBBINS, INCORPORATED, PLAINTIFFS-APPELLANTS, v. CHARMLEY DRUG CO., A BODY COR-PORATE, DEFENDANT-RESPONDENT.

Argued November 24, 1952—Decided March 2, 1953.

528

*Mr. Joseph H. Stamler* argued the cause for appellants (*Mr. Walter F. Waldau,* of counsel; *Messrs. John P. Mc-Grath, Marland Gale* and *Laurence C. Ehrhardt,* of the New York bar, on the brief; *Messrs. Lorentz & Stamler,* attorneys for Johnson & Johnson; *Messrs. Stryker, Tams & Horner,* attorneys for McKesson & Robbins, Incorporated).

*Mr. Joseph Kraemer* argued the cause for respondent.

The opinion of the court was delivered by

HEHER, J. The question for decision is whether the defendant retailer of pharmaceutical supplies in interstate commerce is in the particular circumstances a "signer" of a minimum price-fixing agreement made between the appellant corporations, Johnson & Johnson, a manufacturer of medical and surgical supplies and dressings, and McKesson & Robbins, Incorporated, a wholesale distributor of products of this class, within the intendment of the Miller-Tydings Amendment of the Sherman Anti-trust Act adopted August 17, 1937 (26 *Stat.* 209, c. 647; 50 *Stat.* 673, 693, c. 690; 15 *U. S. C. A., sec.* 1), as expounded by the United States Supreme Court in *Schwegmann Bros. v. Calvert Distillers Corporation,* 341 *U. S.* 384, 71 *S. Ct.* 745, 95 *L. Ed.* 1035, 19 *A. L. R.* 2d 1119 (1952).

Plaintiffs seek a judicial declaration under the New Jersey Declaratory Judgments Act (*R. S.* 2:26–66 *et seq.*) of the subsistence and legal enforceability of the stated minimum-price arrangement made pursuant to the Fair Trade Act of

New Jersey (*R. S.* 56:4–3 *et seq.*) between the plaintiff manufacturer and the plaintiff wholesaler and an asserted implementing agreement binding the defendant retailer not to resell the products of Johnson & Johnson purchased by defendant from McKesson & Robbins, by direct or indirect means, at less than the minimum resale price established by Johnson & Johnson, and for an injunction to that end.

The Superior Court, Judge Freund sitting, concluded that defendant was a "nonsigner" within the interpretive principle of the *Schwegmann* case, and therefore not bound by the price arrangement made by the plaintiff corporations between themselves; and the complaint was accordingly dismissed. Plaintiffs' joint appeal from the subsequent judgment to the Appellate Division of the Superior Court was certified here for decision.

The basic point made is that the plaintiff wholesaler and the defendant retailer "voluntarily entered into a binding contract under principles of contract law" which is "a valid and enforceable fair trade contract under the statutes." Interstate commerce is conceded. The postulate is that the Miller-Tydings Amendment "does not prohibit all fair trade contracts except those in writing and actually signed by the parties to be bound."

This is the situation of fact:

Johnson & Johnson is a New Jersey corporation; and McKesson & Robbins, a Maryland corporation. The former operates manufacturing plants in New Jersey, New York and Illinois; the latter is a wholesale distributor of the products of various manufacturers, including Johnson & Johnson's, and maintains warehouses and offices in most of the states of the Union, including New Jersey. Johnson & Johnson's trademarked commodities are sold throughout the Union subject to a minimum price schedule of which notice is given to the trade from time to time through its own price pamphlets and by means of other drug publications. Their products are traded in free and open competition with commodities of the same class produced or distributed by

others. Defendant, a New Jersey corporation, operates a retail drug store in Newark, New Jersey. The crucial evidence is largely documentary.

On July 2, 1951 the Newark, New Jersey, Division of McKesson · & Robbins forwarded a letter to all its retail customers, defendant among them, stating that "by virtue of fair trade contracts entered into" by named manufacturers, the writer had been "authorized and obligated to get retail fair trade agreements from all" of its customers binding them "to sell commodities of these manufacturers at not less than the net minimum retail prices prescribed by the manufacturer in accordance with the applicable fair trade laws of the states where the sales are made." The letter then advised the addressee that the "method of your entering into the contract will be through the inclusion of a fair trade agreement in our regular terms of sale so that whenever you buy from us you will know that the purchase includes an obligation on your part as follows:

"FAIR TRADE AGREEMENT. Purchaser, by accepting delivery from Seller of any fair traded · commodity, agrees not to resell such commodity, by direct or indirect means, at less than the prescribed net retail minimum price published by the Producer or Distributor whose trademark, brand or name appears on the commodity. · This agreement not applicable to sales in non-fair trade states or District of Columbia !"

The letter continued:

"To confirm and reiterate this agreement on your part, the terms thereof will be placed on every invoice which we will hereafter send to you."

The letter listed three manufacturers whose products were then covered by McKesson's fair trade agreement. Johnson & Johnson was not among them; but the letter said:

"At the present time the legend agreement will not apply to products of other manufacturers. However, whenever additional manufacturers may obligate us to get a fair trade agreement for

them we shall give you notice thereof and after you receive such notice the legend agreement will apply to any purchases you may thereafter make of products of such additional manufacturers."

On July 5, 1951, McKesson sent a second letter to its retail customers, including defendant, headed as to subject matter: "Fair Trade Legend Agreement—Johnson & Johnson Products Also Covered." The letter read:

"Under date of July 2nd we wrote to you about the Fair Trade Agreement, terms of which will continue to appear on every invoice which we will hereafter send to you.

We are pleased to announce that in addition to the manufacturers listed in the letter of July 2nd, Johnson & Johnson has now obligated us to get a Fair Trade Agreement from our customers covering the products of Johnson & Johnson.

Therefore, whenever you make any purchases hereafter of the products of Johnson & Johnson, as well as of the products of the other manufacturers listed in our letter of July 2nd you will know that those products are subject to and covered by the Fair Trade Agreement which will appear on our invoices."

Defendant admits the receipt of these letters; and there is evidence that Johnson & Johnson gave notice to the trade of the prescribed minimum retail prices of the subject commodities, by means of pamphlets, trade journals and otherwise, before defendant's purchases, and periodically thereafter, although there was no price change during the period involved in this inquiry.

On July 9, 1951, defendant placed orders by telephone with both the Newark Division and the New York Division of McKesson for Johnson & Johnson commodities. On the following day, each division accepted the order and made delivery to defendant with the "Fair Trade Agreement" embodied in McKesson's letter of July 2 endorsed on the invoice. In addition, by letter dated the same day, the New York Division of McKesson advised defendant that the "order * * * is subject to the Fair Trade Agreement referred to in the letters of July 2nd, 1951 and July 5, 1951 sent to you by our Newark Division," and the agreement "is included in our regular terms of sale as set forth on the

invoice accompanying the merchandise which is being delivered to you with this letter," and "will be included in any subsequent sales of Johnson & Johnson products made by this Division to you or any other retailer in New Jersey."

The goods, the two invoices, and the letter were received on July 10, and on the following day defendant wrote this letter to McKesson's Newark Division:

"On July 9th, 1951, I ordered from your New York and Newark wholesale divisions some Johnson & Johnson and Tek products. This merchandise was delivered to the store on July 10, 1951. I note from the invoices that Charmley Drug Co. is to sell these Johnson & Johnson and Tek products at the Fair Trade prices.

I have accepted delivery of this merchandise but wish to advise you that your Fair Trade agreement as set forth on the invoices and in your notices does not bind us and is illegal. Therefore, we are at liberty to sell the merchandise below Fair Trade prices."

Copies of this letter were sent to McKesson's main office in New York and its New York Division office, and to Johnson & Johnson at New Brunswick, New Jersey; and not long thereafter this proceeding was commenced.

Defendant has not tendered a return of the merchandise.

Since this action was begun the defendant has made purchases of other commodities directly from Johnson & Johnson under invoices bearing the self-same "Fair Trade Agreement"; and it has also purchased from a Philadelphia wholesaler Johnson & Johnson products without a "fair trade agreement." The insistence is that the endorsement of this article on the face of the invoices renders the sales subject to that minimum price arrangement as a component of the contract.

It is said that the prescribed minimum retail prices for the subject commodities had been widely disseminated among the trade before the purchases were made by defendant, and thereby the terms of the asserted contract had been rendered sufficiently certain and definite for enforcement by judicial decree. Actual notice of the minimum resale prices is not seriously challenged, and may well be assumed.

 However it may be phrased, the essence of the argument is that by this device the defendant retailer became bound by the circumstances to observe the resale price limitations thus sought to be laid upon him, even though there had been no consensual acquiescence in the restriction, but rather an unequivocal disavowal of the obligation, then and thereafter. But, considered in the light of the explication of the Miller-Tydings Act in the *Schwegmann* case, the statement of the proposition carries its own refutation. The acceptance of the goods with definitive notice of the rejection of the price restriction precluded the formation of a contract within the intendment of the Miller-Tydings Act.

 The Sherman Anti-Trust Act, in its original state, denounced as unlawful "every contract" in restraint of trade or commerce among the several states. 26 *Stat.* 209, *c.* 647; 15 *U. S. C. A., sec.* 1. The condemnation extended to vertical price-fixing agreements, *i. e.*, agreements between a manufacturer or wholesaler on the one hand and a retailer on the other, and agreements between a manufacturer and a wholesaler. Minimum price arrangements were illegal *per se. Dr. Miles Medical Co. v. John D. Park & Sons Co.,* 220 *U. S.* 373, 31 *S. Ct.* 376, 55 *L. Ed.* 502 (1911); *United States v. Socony-Vacuum Oil Co.,* 310 *U. S.* 150, 60 *S. Ct.* 811, 84 *L. Ed.* 1129 (1940); *United States v. Univis Lens Co.,* 316 *U. S.* 241, 62 *S. Ct.* 1088, 86 *L. Ed.* 1408 (1942); *United States v. Bausch & Lomb Optical Co.,* 321 *U. S.* 707, 64 *S. Ct.* 805, 88 *L. Ed.* 1024 (1944); *Kiefer-Stewart Co. v. Joseph E. Seagram & Sons, Inc.,* 340 *U. S.* 211, 71 *S. St.* 259, 95 *L. Ed.* 219 (1951). Price-maintenance contracts and agreements remain within the interdiction of the Sherman Act except as modified by the Miller-Tydings Act. Where interstate commerce is involved, the state is powerless to immunize price fixing, absent consent by the Congress. *United States v. Frankfort Distilleries,* 324 *U. S.* 293, 63 *S. Ct.* 661, 89 *L. Ed.* 951 (1935); *Schwegmann Bros. v. Calvert Distilleries Corporation,* cited *supra.*

The common pattern of the state "fair trade" regulation sanctions agreements for "vertical" retail price-fixing in relation to trademarked or branded commodities sold in fair and open competition with other commodities of the same general class, binding also upon retailers not parties to the contract who had notice of the price arrangement under what has come to be known as the "nonsigner clause." The design of the Miller-Tydings' Act was to alleviate the proscriptions laid by the Sherman Act upon such price-maintenance agreements valid under local law, where interstate commerce is involved. The present inquiry is directed to the scope of the immunity.

The Miller-Tydings Amendment provides that nothing therein contained "shall render illegal, contracts or agreements prescribing minimum prices for the resale" of the specified trademarked or branded commodities "when contracts or agreements of that description are lawful as applied to intrastate transactions" under local law. The making of such contracts or agreements is not to be deemed "an unfair method of competition" under the Sherman Act. 50 *Stat.* 673, 693, c. 690; 15 *U. S. C. A., sec.* 1. But the immunity of the amendment is limited; it does not extend to "horizontal" price-fixing agreements. Excluded from the proviso are minimum price-fixing contracts or agreements "between manufacturers, or between producers, or between wholesalers, or between brokers, or between factors, or between retailers, or between persons, firms, or corporations in competition with each other." And the federal act does not have the nonsigner provision.

The New Jersey Fair Trade Act sanctions vertical minimum price maintenance in intrastate transactions. And it has a nonsigner clause. It is therein provided that no "contract" relating to the sale or resale of a trademarked or branded commodity in fair and open competition with commodities of the same general class produced by others shall be rendered unlawful by reason of provisions (a) against resale by the buyer except at the price stipulated by the

vendor, or (b) a requirement by the producer or vendee of the commodity that the purchaser agree that he will not, in turn, resell except at the price stipulated by the producer or vendee. *R. S.* 56:4–5. And the willful and knowing advertising, offering for sale or selling any commodity at less than the price stipulated in any contract made pursuant to *R. S.* 56:4–5, "whether the person so advertising, offering for sale or selling is or is not a party to such contract," constitutes "unfair competition" actionable at the suit of the producer or distributor of the commodity or any retailer selling such commodity at not less than the price fixed in the contract. *R. S.* 56:4–6, as amended.

This regulation has been found sufficient under the due process and equal protection clauses of the Fourteenth Amendment: *Johnson & Johnson v. Weissbard,* 121 *N. J. Eq.* 585 *(E. & A.* 1937); *Bristol-Myers Co. v. L. Bamberger & Co.,* 122 *N. J. Eq.* 559 *(Ch.* 1937), affirmed 124 *N. J. Eq.* 235 *(E. & A.* 1938); *Old Dearborn Distributing Co. v. Seagram-Distillers Corporation,* 299 *U. S.* 183, 57 *S. Ct.* 139, 81 *L. Ed.* 109 (1936).

But the Miller-Tydings Act does not make minimum price-fixing contracts enforceable against "nonsigners" in the field of interstate commerce. This statute grants but a limited immunity from the ban of the Sherman Act. A distributor and one or more retailers can with impunity enter into an agreement for price maintenance if state law permits; but the ensuing contractual obligation does not extend to retailers not parties to the stipulation, for that would not constitute price maintenance by "contract or agreement," but rather price fixing by compulsion.

The consensual element is fundamental in the immunizing provision of the Miller-Tydings Act; coercion is forbidden, and thus is excluded from the domain of interstate commerce the compulsory subjection of nonsigners to the price-fixing arrangement. Said Mr. Justice Douglas in the *Schwegmann* case [341 *U. S.* 384, 71 *S. Ct.* 746]: This statute exempts only "contracts or agreements prescribing minimum prices

for the resale" of the articles purchased, not "contracts or agreements" regulating "the practices of noncontracting competitors of the contracting retailers." The act in express terms continues the prohibitions of the Sherman Act against "horizontal" price fixing "by those in competition with each other at the same functional level." Therefore, continued Justice Douglas,

"when a state compels retailers to follow a parallel price policy, it demands private conduct which the Sherman Act forbids. * * * Elimination of price competition at the retail level may, of course, lawfully result if a distributor successfully negotiates individual 'vertical' agreements with all his retailers. But when retailers are *forced* to abandon price competition, they are driven into a compact in violation of the spirit of the proviso which forbids 'horizontal' price fixing. A real sanction can be given the prohibitions of the proviso only if the price maintenance power granted a distributor is limited to *voluntary* engagements. Otherwise, the exception swallows the proviso and destroys its practical effectiveness."

Adherence to the price-fixing scheme cannot be commanded by local legislative *fiat*; it must be voluntary in fact. "Contracts or agreements," declared Justice Douglas,

"convey the idea of a cooperative arrangement, not a program whereby recalcitrants are dragged in by the heels and compelled to submit to price fixing. * * * It should be remembered that it was the state laws that the federal law was designed to accommodate. Federal regulation was to give way to state regulation. When state regulation provided for resale price maintenance by both those who contracted and those who did not, and the federal regulation was relaxed only as respects 'contracts or agreements,' the inference is strong that Congress left the noncontracting group to be governed by preexisting law."

It is urged that, even so, defendant's acceptance of the goods sold constituted a true contract conditioned by the "Fair Trade Agreement" endorsed on the invoices, and so there was a "valid agreement" under the state law within the concept of the Miller-Tydings Act, although the contract was not "signed" in the formal or conventional sense. The

argument is that the existence of a price-maintenance contract is fundamentally a question of state law, even though interstate commerce is involved, and the assent requisite to a contractual obligation "arises from conduct and dealings and from acceptance with full knowledge of the consequences of acceptance," and "no signature is required."

True, under the State Uniform Sale of Goods Law a contract to sell or a sale "may be made in writing either with or without seal, or by word of mouth, or partly in writing, and partly by word of mouth, or may be inferred from the conduct of the parties." *R. S.* 46:30–9. And the buyer is deemed to have accepted the goods when he "intimates to the seller that he has accepted them, or when the goods have been delivered to him, and he does any act in relation to them which is inconsistent with the ownership of the seller." *R. S.* 46:30–54. *Vide Hays v. Krasny,* 101 *N. J. L.* 390 (*E. & A.* 1925). Defendant invokes these provisions and the principle that "assent may be indicated by acts as well as words"—citing *Decker v. Smith & Co.,* 88 *N. J. L.* 630 (*E. & A.* 1915) ; *Murray v. Cunard S. S. Co.,* 235 *N. Y.* 162, 139 *N. E.* 226, 26 *A. L. R.* 1371 (*Ct. App.* 1923) ; *Williston on Contracts (rev. ed.), sections* 90, 90*A*, 1856; *Restatement, Contracts, sections* 72(1)(*a*), 72(2).

But a contract does not come into being unless there be a manifestation of mutual assent by the parties to the same terms; and, while the manifestation of mutual assent is usually had by an offer and an acceptance either in words or by conduct, it is elementary that there can be no operative acceptance by acts or conduct unless the offeree's assent to the offer according to its terms is thereby unequivocally shown. There must needs be an agreement—a "meeting of the minds" on the subject matter, to use a classic time-honored term, or there is no legally enforceable obligation. An expression of assent that modifies the substance of the tender, while it may be operative as a counter-offer, is yet not an acceptance and does not consummate a contract. In the very nature of the contract, acceptance must be absolute.

*Potts v. Whitehead*, 23 *N. J. Eq.* 512 (*E. & A.* 1872); *Runyon v. Wilkinson, Gaddis & Co.*, 57 *N. J. L.* 420 (*E. & A.* 1894); *Corn Exchange National Bank & Trust Co. v. Taubel*, 113 *N. J. L.* 605 (*E. & A.* 1934). If the contemplated agreement is to be bilateral, the "offeror and offeree, alike, must express agreement as to every term of the contract. The offeror does this in the offer; the offeree must do it in his acceptance." *Corbin on Contracts* (1950), *sections* 9, 28, 29, 82, 83.

▮ Such is the nature of the contract. The terms "contract" and "agreement" as here used have the same legal connotation. A contract is an agreement resulting in obligation enforceable at law; and it is basic to an agreement entailing obligatory legal consequences that the parties have a distinct intention common to both. "Doubt or difference is incompatible with agreement." *Anson on Contracts* (*Turck's ed.* 1929), *sections* 2, 3. In a word, a contract is a voluntary obligation proceeding from a common intention arising from an offer and acceptance. It is requisite that there be an unqualified acceptance to conclude the manifestation of assent. Conduct may take the place of written or spoken words in the formation of contracts; but silence does not ordinarily serve as an acceptance of an offer, although it may suggest acceptance where the particular circumstances reasonably impose on the offeree a duty to speak if the offer is rejected. *Ibid. section* 23.

Here, the wills of the parties were not one on the obligatory price-maintenance proposal; and there was no common intention to that end. An inference of unconditional acceptance was not reasonably derivable from defendant's conduct; quite the contrary. Defendant promptly advised plaintiffs that the provision endorsed on the invoices would not be acceptable, then or thereafter, and no contract in those terms was consummated, although defendant became liable for the price of the goods delivered under a contract implied in fact. This is the sum of the obligation incurred by defendant; in the face of the affirmative rejection of the resale

minimum price restriction it cannot be enlarged to include that provision by conduct.

A holding *contra* would do violence to fundamental principles of contract and the outstanding intent and policy of the Miller-Tydings Act. This enactment has reference to the true contract or agreement arising from the voluntary will of the parties, sometimes termed "reality of consent"; and it must be enforced as written. The Federal Government has undertaken supervision of this undoubted field of interstate action; and the contract or agreement qualifying the restraints of the original Sherman Act must conform to the requirements of the Amendment. It is necessary that there be a contract in law and in fact. This has been determined by the federal judicial authority; and conformity by the State is imperative in this sphere of federal action. The Supremacy Clause of the Federal Constitution governs here. *Article VI, paragraph 2.* Compare *Adams Express Co. v. Croninger*, 226 *U. S.* 491, 33 *S. Ct.* 148, 57 *L. Ed.* 314 (1913); *Kansas City Southern Ry. Co. v. Van Zant*, 260 *U. S.* 459, 43 *S. Ct.* 176, 67 *L. Ed.* 348 (1923). See, also, *Williston on Contracts (rev. ed.), section 90 BB.*

No relief is now sought under the McGuire Act adopted by the Congress July 14, 1952, after this appeal was taken, as an amendment to the Federal Trade Commission Act (*Public Law 542, c. 745, H. R. 5767*); and we have no occasion to say more than that, although seeming to immunize also the nonsigner provisions of state acts, this statute is not retroactive in its operation and does not affect the particular transactions at issue here. See the companion case of *Hoffmann-LaRoche, Inc. v. Weissbard*, 11 *N. J.* 541.

Judgment affirmed.

*For affirmance*—Chief Justice VANDERBILT, and Justices HEHER, OLIPHANT, WACHENFELD, BURLING and BRENNAN —6.

*For reversal*—None.