721 A.2d 1028 (1999)
Charles A. GAGLIA, Jr., Plaintiff-Appellant,
v.
Robert P. KIRCHNER, and Rosemary Kirchner, Defendants-Respondents.
Superior Court of New Jersey, Appellate Division.
Argued November 4, 1998.
Decided January 14, 1999.
Robert G. Rose, Morristown, for plaintiff-appellant (Pitney, Hardin, Kipp & Szuch, attorneys: Mr. Rose and Paul J. Halasz, on the brief).
*1029 Mark S. Haubenstock, Wayne, for defendants-respondents.
Before Judges PRESSLER, BROCHIN and KLEINER.
The opinion of the court was delivered by BROCHIN, J.A.D.
Plaintiff Charles A. Gaglia contracted with defendants Robert P. Kirchner and Rosemary Kirchner to buy their house. Before the sale had been consummated, defendants contended that the contract had been rescinded pursuant to its attorney review clause, see N.J.A.C. 11:5-6.2, and they contracted to sell the house to another buyer.
Mr. Gaglia sued for specific enforcement or, alternatively, damages. He also alleged that the Kirchners had committed both common law fraud and violations of the Consumer Fraud Act, N.J.S.A. 56:8-1 et seq. The Chancery Division granted defendants' motion for summary judgment dismissing plaintiff's complaint, and plaintiff has appealed. We affirm.
Because this is an appeal from an order granting summary judgment, we are obliged to accept plaintiff's version of the facts and to give him the benefit of all favorable inferences reasonably inferable from those facts. Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 538, 666 A.2d 146; R. 4:46-2(c). We will summarize the facts of the case consistently with these requirements.
In the late spring of 1997, plaintiff began to look for a house available for purchase in the vicinity of Wayne, New Jersey. He retained Francine Elmo, a realtor associated with Coldwell Banker Realtors, to assist him in his search. Ms. Elmo knew that Mr. and Ms. Kirchner, both of whom were also realtors associated with Coldwell Banker, were offering their home for sale, and she thought that it might satisfy Mr. Gaglia's requirements.
Ms. Elmo first showed the house to Mr. Gaglia on May 13, 1997. The Kirchners' asking price was $750,000. On May 15, 1997, Mr. Gaglia tendered a contract to purchase their house for $700,000, but his offer was refused. On May 19, 1997, he requested Ms. Elmo to tell the Kirchners that he was about to sign a contract to purchase another house and to ask them again, before he did, whether they would accept his $700,000 offer. They responded that they were willing to accept $735,000. Mr. Gaglia was unwilling to pay more than $700,000; therefore, he made an offer on the other house. He reached an agreement with that vendor on a price, but continued to negotiate other terms of a proposed contract.
On June 5, 1997, Ms. Kirchner told Ms. Elmo that she and her husband were ready to accept Mr. Gaglia's $700,000 offer. Mr. Gaglia had not yet completed negotiations for the other house. He knew that the Kirchners had offered their house for sale the previous year and had then changed their minds and withdrawn it from the market. He was concerned that they might change their minds again after he had terminated negotiations for the other house. He therefore told Ms. Elmo he was willing to purchase the Kirchners' house for $700,000, but before he renewed his offer, he wanted them to promise expressly that they would honor the contract and see it through to closing. She communicated Mr. Gaglia's position to the Kirchners and they agreed that they would honor the contract.
On June 7, 1997, after revisiting the Kirchners' house, Mr. Gaglia told Ms. Elmo that he would reinstate his $700,000 offer. He redated his originally tendered contract and initialed a few changes. That same day, Ms. Elmo met the Kirchners at their house. She told them that Mr. Gaglia would be giving up his opportunity to purchase the other house that he had been negotiating to buy and he therefore wanted to be sure that they would honor his contract to purchase their house for $700,000. They assured Ms. Elmo that there would be no problem, that they were satisfied with the contract, and that they had every intention of honoring it. They executed the contract and it was dated June 7, 1997. In reliance on the Kirchners' having signed the contract, Mr. Gaglia terminated his negotiations to buy the other house.
The contract had been prepared by Ms. Elmo on a Coldwell Banker form. It contained the attorney review provisions required *1030 by N.J.A.C. 11:5-6.2. The following clause appears at the top of the form, in large lettering:
THIS IS A LEGALLY BINDING CONTRACT THAT WILL BECOME FINAL WITHIN THREE BUSINESS DAYS. DURING THIS PERIOD YOU MAY CHOOSE TO CONSULT AN ATTORNEY WHO CAN REVIEW AND CANCEL THE CONTRACT. SEE SECTION ON ATTORNEY REVIEW FOR DETAILS.
The attorney review section reads:
1. Study by Attorney
Buyer or Seller may choose to have an attorney study this Contract. If an attorney is consulted, the attorney must complete his or her review of the Contract within a three (3) day period. This Contract will be legally binding at the end of this three (3) day period unless an attorney for Buyer or Seller reviews and disapproves of this Contract.
2. Counting the Time.
You count the three (3) days from the date of delivery of the signed Contract to Buyer and Seller. You do not count Saturdays, Sundays or legal holidays. Buyer and Seller may agree in writing to extend the three (3) day period for attorney review.
3. Notice of Disapproval.
If an attorney for Buyer or Seller reviews and disapproves of this Contract, the attorney must notify the REALTOR(s) and the other party named in this Contract within the three (3) day period. Otherwise, this Contract will be legally binding as written. The attorney must send the notice of disapproval to the REALTOR(s) and to the other party by certified mail, by telegram or by delivering it personally. The telegram or certified letter will be effective upon sending. The personal delivery will be effective upon delivery to the REALTOR'S office and to the other party. The attorney may also, but need not, inform the REALTOR(S) or the other party of any suggested revision(s) in the Contract that would make it satisfactory.
The "delivery" of the signed contract between Mr. Gaglia and the Kirchners occurred on Saturday, June 7, 1997. On Monday, June 9, 1997, Mr. Gaglia gave a copy of it to R. Dale Winget, Esq., his New Jersey attorney, for his review.
On Tuesday, June 10, Mr. Winget sent a letter to Roy H. Binder, Esq., the New Jersey attorney representing the Kirchners, by fax and by ordinary mail. He did not send it by telegram or certified mail and he did not deliver it personally. He did not send a copy to Coldwell Banker.
Mr. Winget's letter states, "I represent the Buyer.... I have reviewed the Contract for Sale of Real Estate prepared by the Realtor. I do not approve the Contract in its present form [emphasis added]. It would be acceptable, however, with the following changes and amendments...." The letter proposed, among other modifications, describing the property, which the contract described only by its street address, by metes and bounds and by reference to a survey map to be attached; deleting some provisions relating to the manner in which Coldwell Banker would hold deposits in escrow; changing the place of closing of title to the buyer's attorney's office; adding a representation by the sellers that, to the best of their knowledge and belief, there was no underground oil storage tank, either abandoned or in use, on the property and allowing either party to cancel the contract if any oil leakage was detected, unless the sellers, at their own expense, remediated any soil contamination; and stipulating that the real estate commission would become earned, due and payable only upon closing of title and payment of the purchase price to the seller.
Mr. Gaglia had the Kirchners' house inspected by a professional home inspector on Friday, June 13, 1997. Mr. Gaglia, Ms. Elmo and the Kirchners were present at the house during the inspection. During the inspection, the Kirchners took a call from Mr. Binder, their attorney. He told them about the letter he had received the previous Wednesday from Mr. Winget, Mr. Gaglia's attorney, modifying the contract. After the telephone conversation, Ms. Kirchner told Ms. Elmo that there were no problems with the *1031 proposed changes to the contract, except that she wanted the closing to take place at her attorney's office. The inspection then continued.
On the day of the inspection, Ms. Elmo noticed that there was still a "for sale" sign in front of the Kirchners' house. Ms. Kirchner denied that she was continuing to show the house to prospective buyers and claimed that, when anyone called after seeing the sign, she told the caller that the house was under contract and she would take their name and telephone number in case the deal fell apart.
On Monday, June 16, 1997, Mr. Binder faxed a letter of that date to Mr. Winget. The letter states:
I have received your disapproval of the contract and have reviewed the same with my clients. My clients do not wish to pursue this matter any more with your clients. The contract shall be considered void, and this letter shall act as authorization to have the broker return any deposits that may have been made.
Later that same day, Ms. Kirchner told Ms. Elmo that she and her husband had decided that they could probably get a better offer. They had opened their house to interested persons over the weekend, and, by the end of the weekend, they had accepted the best offer they could get. This offer was at a higher price than Mr. Gaglia's. This suit was filed on June 24, 1997.
On appeal, Mr. Gaglia argues, as he did before the trial court, that Mr. Winget's June 10 disapproval letter did not terminate the contract because the manner it which it was sent deviated from the requirements of N.J.A.C. 11:5-6.2, that the Kirchners' unconscionable conduct precluded them from waiving these deviations, that their permitting the house inspection to proceed showed that they considered the contract to remain in force and estopped them from treating it as terminated, and that their subsequent repudiation of the contract was therefore a breach. Mr. Gaglia also reiterates his contentions that the Kirchners committed common law fraud and violated the Consumer Fraud Act.
The summary judgment court held that the party who invoked the attorney review provision to annul the contract could not avoid the consequences of his doing so by relying on his own deviations from the procedure prescribed by N.J.A.C. 11:5-6.2. Therefore, the Chancery Division ruled, the contract was at an end once Mr. Winget had sent his June 10 letter, and the Kirchners were entitled to act accordingly. Levison v. Weintraub, 215 N.J.Super. 273, 277-78, 521 A.2d 909 (App.Div.), certif. denied, 107 N.J. 650, 527 A.2d 470 (1987): Trenta v. Gay, 191 N.J.Super. 617, 621-22, 468 A.2d 737 (Ch. Div.1983).
We agree with these holdings. But our affirmance of the Chancery Division's grant of summary judgment in favor of the Kirchners need not be based on its reasoning alone. Our affirmance also flows from basic precepts of contract law. When Mr. Gaglia and Mr. and Ms. Kirchner signed the purchase agreement, they had a binding contract that would not have been subject to unilateral modification by either party in any manner if it had not included an attorney review provision. If Mr. Winget's June 10, 1997 letter was not effective to invoke the attorney review provision, his unequivocal declaration on behalf of Mr. Gaglia that he did "not approve the Contract in its present form," but that he would approve it with specified modifications, was a declaration that Mr. Gaglia did not intend to perform the signed contract unless it was changed. Absent the attorney review provision, this declaration would have been an anticipatory breach of the contract. See Ross Sys. v. Linden Dari-Delite, Inc., 35 N.J. 329, 340-41, 173 A.2d 258 (1961); Miller & Sons Bakery Co. v. Selikowitz, 4 N.J.Super. 97, 101, 66 A.2d 441 (App.Div.1949); Seitz v. Mark-O-Lite Sign Contractors, Inc., 210 N.J.Super. 646, 654, 510 A.2d 319 (Law Div.1986); Restatement (Second) of Contracts § 250 (1981). A non-breaching party to a contract faced with the other party's anticipatory breach may choose to attempt to persuade the breaching party to retract his repudiation and to perform. But the non-breaching party is not required to do so. He is entitled to treat the other party's repudiation as terminating the contract and relieving him of any *1032 further obligation of performance. Friedlander v. Gross, 63 N.J.Super. 470, 474-75, 164 A.2d 761 (App.Div.1960); Conrad v. Lenox Realty Co., 118 N.J. Eq. 592, 597, 180 A. 639 (Ch.1935); O'Neill v. Supreme Council American Legion of Honor, 70 N.J.L. 410, 412, 57 A. 463 (Sup.Ct.1904); Restatement (Second) of Contracts § 253. Consequently, the Kirchners were free to show and sell their house to another party after June 10 because their contract with Mr. Gaglia had been terminated either by a valid exercise of the attorney review provision or by their acceptance of his anticipatory breach.
For Mr. Gaglia's estoppel argument to prevail, he would have to show that after Mr. Winget's June 10 letter gave the Kirchners the right to terminate their contract, Mr. Gaglia reasonably relied to his detriment on conduct by the Kirchners indicating that the contract was still in effect. See Palatine I v. Planning Bd. of Montville, 133 N.J. 546, 563, 628 A.2d 321 (1993) (stating that "only justified and reasonable reliance warrant[s] the application of equitable estoppel"); Foley Mach. Co. v. Amland Contractors, Inc., 209 N.J.Super. 70, 75-76, 506 A.2d 1263 (App.Div.1986). In this case, there is no evidence that Mr. Gaglia reasonably relied to his detriment on anything the Kirchners said or did after they received the June 10 letter. By June 10, the house inspection on June 13 had probably already been arranged, but even if it had not been or if it could have been canceled without cost, proceeding with the inspection was not inconsistent with the abrogation of the contract in its then existing form. It was perfectly reasonable for all parties to proceed with the inspection because of the likelihood that they would agree on a new contract. After Mr. Binder's receipt of Mr. Winget's disapproval letter, they did not have a binding contract and would not have one unless and until the prospective buyer and sellers all agreed in writing to identical terms. Johnson & Johnson v. Charmley Drug Co., 11 N.J. 526, 538-39, 95 A.2d 391 (1953); Looman Realty Corp. v. Broad St. Nat'l Bank of Trenton, 74 N.J.Super. 71, 82, 180 A.2d 524 (App.Div.), certif. denied, 37 N.J. 520, 181 A.2d 782 (1962); Carlin v. City of Newark, 36 N.J.Super. 74, 89, 114 A.2d 761 (Law Div.1955); Restatement (Second) of Contracts §§ 58, 59, 61. Showing their house to other prospective buyers after June 10 was therefore not inconsistent with the assurances the Kirchners had given Mr. Gaglia and Ms. Elmo to honor their contract, and assuring him during the house inspection that they had no significant objections to the terms of the revised contract which Mr. Winget proposed was not the same as having a binding contract in force.
Kutzin v. Pirnie, 124 N.J. 500, 591 A.2d 932 (1991), illustrates what might have been done to avoid the predicament in which Mr. Gaglia found himself. In that case, which also involved a contract prepared by realtors for the purchase and sale of a residential property, the vendors' and the vendees' attorneys sent each other letters suggesting various modifications. But the language of both attorneys was precatory. Neither conditioned the viability of the contract on the acceptance of his proposals. Consequently, the letters in Kutzin, unlike the letter by Mr. Winget in the present case, did not terminate the contract either by repudiation or by the effective exercise of its attorney review provision.[1]
Mr. Gaglia has not shown facts from which a trier of fact could reasonably find that the Kirchners' undertaking to honor their contract was fraudulent or that their showing their house to other prospective buyers after June 10 was a violation of the Consumer Fraud Act. They did not act inconsistently with their contract until that contract was no *1033 longer in effect because of action chargeable to Mr. Gaglia.
The judgment appealed from is therefore affirmed.
NOTES
[1] In practice, the three-day window provided by N.J.A.C. 11:5-6.2 within which a real estate purchase agreement can be disaffirmed presents the purchaser's attorney and his client with difficult problems. Whether or not to disaffirm generally depends on the balance between any inadequacies of the signed contract and the client's appraisal of the risk and consequences of losing the property. The decision whether to disaffirm requires a careful discussion between the lawyer and client. Three days is frequently too short a time to arrange and conduct such a discussion, and a decision whether or not to disaffirm must be reached with inadequate consideration. Under these circumstances the attorney ordinarily has no practical alternative but to recommend disaffirmance to the client, making clear to the client, however, that the loss of the transaction may ensue before negotiations have been concluded.