**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1016-16T1

SMS FINANCIAL XXIX, LLC, as
Assignee of FULTON BANK
NATIONAL ASSOCIATION,
Successor by Merger to THE BANK,
Successor by Merger to FIRST
WASHINGTON STATE BANK,

     Plaintiff–Respondent,

v.

MARK O'DEA,

     Defendant–Appellant,

and

STUART CAROTHERS, JR.,
and CYNTHIA C. CAROTHERS,

     Defendants.

_____

Argued April 26, 2018 – Decided September 12, 2018

Before Judges Simonelli and Rothstadt.

On appeal from Superior Court of New Jersey, Chancery Division, Mercer County, Docket No. F-047339-10.

Brian H. Fenlon argued the cause for appellant (Carella, Byrne, Cecchi, Olstein, Brody & Agnello, PC, attorneys; Brian H. Fenlon, of counsel and on the briefs).

Charles A. Gruen argued the cause for respondent (Law Offices of Charles A. Gruen, attorneys; Charles A. Gruen, of counsel and on the brief; Rosa Amica-Terra, on the brief).

PER CURIAM

Defendant Mark O'Dea appeals from the May 20, 2016 Chancery Division order, which suppressed his answer with prejudice, established the right of plaintiff SMS Financial XXIX, LLC, as assignee of Fulton Bank National Association (Fulton), successor by merger to The Bank, successor by merger to First Washington State Bank (FWSB), to foreclose on his property. Defendant also appeals from the September 23, 2016 final judgment of foreclosure. For the following reasons, we affirm.

On May 25, 2006, O'Dea executed an adjustable rate note to FWSB in the amount of $300,000, due and payable in full by May 25, 2007. To secure payment of the note, O'Dea executed two mortgages to FWSB: one on his property located on South Main Street in Pennington (the South Main Street property), and the other on his two properties located on East Delaware Avenue

in Pennington (the East Delaware Avenue properties). The two mortgages contained the following provision:

> Amendments. This Mortgage, together with any Related Documents[1], constitutes the entire understanding and agreement of the parties as to the matters set forth in the Mortgage. <u>No alteration of or amendment to this Mortgage shall be effective unless given in writing and signed by the party or parties sought to be charged or bound by the alteration or amendment</u>.
>
> [(Emphasis added).]

O'Dea also executed a Business Loan Agreement, Commercial Security Agreement, and Statement of Business Purpose, wherein he represented and warranted that the "proceeds of the loan [would] be used in a business enterprise." O'Dea does not dispute the validity of any of these documents.

On February 10, 2007, The Bank became successor by merger to FWSB. On March 7, 2008, O'Dea executed a supplement to the note to The Bank, which amended the original note to increase the loan amount to $833,000, due and payable on January 25, 2009. O'Dea also executed mortgage modification agreements in favor of The Bank on the South Main Street property and East Delaware Avenue properties. The mortgage modification agreements provided

---

[1] The mortgages defined "Related Documents," in part, as "all promissory notes, credit agreements, [and] loan agreements[.]"

that the terms of the original mortgages remained in full force and effect. O'Dea does not dispute the validity of these documents.

After O'Dea began construction on the South Main Street property, a dispute arose between him and his neighbors, the Carothers, regarding his access to their property to complete the construction. In August 2007, O'Dea filed a complaint against the Carothers, and in September 2007, the Carothers filed a counterclaim and lis pendens on the South Main Street property. O'Dea did not notify The Bank of the lis pendens.

On June 5, 2008, O'Dea and the Carothers entered into a settlement agreement, whereby O'Dea agreed to pay them $10,000 to access their property and an additional $3000 for a permanent easement on their property to construct, maintain, and upgrade a drainage facility. O'Dea also agreed to complete the construction no later than December 1, 2008, and pay the Carothers $150 per day for every day the construction was not completed. The Carothers agreed to discharge the lis pendens when O'Dea completed the construction.

O'Dea failed to make payments on the note after March 31, 2010, and The Bank declared him in default on April 25, 2010. Instead of foreclosing on the mortgages, on June 24, 2010, The Bank proposed two "Workout Agreement" scenarios to O'Dea, the second of which provided as follows:

[O'Dea] will offer The Bank a [d]eed in [l]ieu of [f]oreclosure on [the] South Main Street [property] subject to real estate taxes paid current by [O'Dea] and clear title being delivered to The Bank;

[O'Dea] will allow The Bank a [thirty]-day due diligence period to inspect all improvements to the property and to review all records with the building department in Pennington, NJ as well as obtain documentation as to the historical records of the property;

[O'Dea] will offer The Bank a $75,000.00 fixed deficiency note secured by a lien on [the] East Delaware Avenue [properties], with repayment terms to be determined between [O'Dea] and The Bank.

O'Dea notified The Bank he was willing to proceed with this scenario, except for the $75,000 note. He counteroffered with a $20,000 note, which The Bank did not accept.

The Bank subsequently performed a title search of the mortgaged properties and discovered the lis pendens on the South Main Street property. Because O'Dea could not convey clear title to the property due to the lis pendens, on September 22, 2010, The Bank filed a foreclosure complaint against him and the Carothers. The court entered default against O'Dea on September 21, 2011, for failure to plead or otherwise defend. The Carothers filed an answer, alleging their lis pendens had priority over the mortgage on the South Main Street property.

5

In the meantime, a dispute arose between O'Dea and the Carothers as to whether O'Dea completed the construction on the South Main Street property. As a result, O'Dea did not pay the $3000 for the easement and the Carothers did not discharge the lis pendens or record the easement. The dispute was submitted to arbitration after the court denied O'Dea's motion to enforce the settlement.

In his June 22, 2011 arbitrator's determination, the arbitrator found O'Dea took no action to acquire the necessary municipal approval to confirm he completed the construction. The arbitrator found that O'Dea's failure to confirm completion "placed [the Carothers] in a positon of uncertainty and necessitated their expenditure of substantial attorney's fees and costs associated with [O'Dea's] previous motion to enforce the [s]ettlement [a]greement and for the conduct of [the] arbitration." Thus, the arbitrator awarded the Carothers counsel fees and costs in the amount of $6797. The arbitrator also required O'Dea to pay the Carothers $3000 for the easement and record the easement. Upon satisfaction of these obligations, the Carothers were to discharge the lis pendens. The arbitrator required all obligations to be completed within thirty days.

O'Dea did not comply with the arbitrator's determination. As a result, the lis pendens remained on the South Main Street property. The Carothers' attorney, Thomas P. Frascella, Esq., advised The Bank that O'Dea's attorney

6

indicated it was unlikely O'Dea would make the payments required by the arbitrator's determination. As a result, The Bank began settlement negotiations with O'Dea and the Carothers.

In October 2011, The Bank sent O'Dea a proposed settlement agreement, which required him to:

> Execute a deed in lieu of foreclosure on the South Main Street property;
>
> Provide The Bank with copies of the plans for the construction on the South Main Street property;
>
> Repay $27,000 plus interest at the rate of 5.5% per annum by April 1, 2013;
>
> Deliver the original permanent easement in recordable form from the Carothers and pay them the required $3000; and
>
> Cause the Carothers to discharge the lis pendens.

The Bank agreed to advance $7000 to O'Dea's attorney, William Robertson, Esq., to be held in his attorney trust account and applied to the payments the arbitrator's determination required O'Dea to make. O'Dea did not sign the proposed settlement agreement or comply with its terms.

In November 2011, Fulton, successor by merger to The Bank, sent O'Dea a second proposed settlement agreement, which was identical to the first proposed settlement agreement, except it named Fulton as the lender, replaced

A-1016-16T1

Robertson with O'Dea's new attorney, Lawrence Wohl, Esq., and extended the payment date for the $27,000 note to May 1, 2013 (the November 2011 proposed settlement agreement). O'Dea did not sign the November 2011 proposed settlement agreement or comply with its terms.

In December 2011, Fulton and the Carothers entered into a settlement agreement, whereby Fulton paid them $15,000 to satisfy O'Dea's obligation under the arbitrator's determination. The Bank also agreed to have the $3000 easement fee released from Wohl's trust account.[2] Fulton also agreed it would dismiss the Carothers from this matter upon receipt of a recorded discharge of lis pendens. The Carothers agreed to provide an access, maintenance, and drainage easement agreement in recordable form[3] and discharge the lis pendens. The Carothers were subsequently dismissed from this matter.

Thereafter, in February 2012, Fulton sent O'Dea a third proposed settlement agreement, which was identical to the November 2011 proposed settlement agreement, except the note amount was increased to $38,459.62 plus interest to be paid by October 1, 2013 (the February 2012 proposed settlement agreement). Of this sum, Fulton would pay $20,000 to O'Dea, $3,459.62 to the

---

[2] Wohl did not send the $3000 to the Carothers until May 22, 2012.

[3] O'Dea did not sign the easement agreement until after May 2012.

arbitrator for his fee, and $15,000 to the Carothers to satisfy O'Dea's obligation under the arbitrator's determination. O'Dea did not sign the February 2012 proposed settlement agreement or comply with its terms. On March 5, 2012, Fulton notified O'Dea it was withdrawing its settlement offer.

On July 24, 2013, Fulton assigned all of its right, title and interest in the note and mortgages to plaintiff. Plaintiff subsequently filed a motion to enter final judgment of foreclosure against O'Dea, and O'Dea filed a motion to vacate the entry of default. In a June 10, 2014 order, Judge Paul Innes: (1) denied plaintiff's motion without prejudice; (2) stayed the matter for thirty days for plaintiff to serve O'Dea with a notice of intent to foreclose; (3) denied the portion of O'Dea's motion to dismiss the complaint; and (4) granted O'Dea's motion to vacate entry of default.

Plaintiff then filed an amended foreclosure complaint. O'Dea filed an answer and counterclaim, seeking to enforce a settlement. The parties engaged in motion practice thereafter, with Judge Innes eventually granting plaintiff partial summary judgment on the execution of the note and mortgages, recording of mortgages, and O'Dea's default.

Judge Innes held a three day bench trial to determine whether the parties had entered into an enforceable settlement agreement and, if so, whether O'Dea

9

had complied with its terms. O'Dea testified he agreed to the second scenario in the "Workout Agreement" The Bank sent in June 2011, disagreed with a $75,000 note, counteroffered a $20,000 note, and believed a settlement was reached by July 23, 2010 and The Bank would discharge the two mortgages if he complied with the settlement terms. O'Dea also testified that after July 2010, the note amount increased to $27,000. He admitted he did not sign the November 2011 proposed settlement agreement or provide a deed in lieu of foreclosure. He also admitted he did not instruct his attorney to file a motion to enforce the settlement for five years and three months after the parties allegedly reached a settlement.

Robertson testified he believed the parties reached a settlement in July 2010, but admitted there remained a dispute over the note amount. He testified that he received the February 2012 proposed settlement agreement, which increased the note amount from $27,000 to approximately $38,800, but the other settlement terms were consistent with the prior proposed settlement agreements.

Robertson admitted he understood there would be a written settlement agreement, and that O'Dea did not sign a settlement agreement or deed in lieu of foreclosure. He also admitted O'Dea told him he agreed to the terms of the

10

November 2011 proposed settlement agreement, but he, Robertson, never relayed that information to The Bank.

The Bank's/Fulton's attorney, Lee Albertson, Esq., testified that The Bank and O'Dea attempted to negotiate a settlement, but no settlement was reached because the parties could not agree on the note amount. Albertson also testified that Robertson never advised him O'Dea agreed to a $38,459.62 note, to pay $3,459.69 to the arbitrator and $15,000 to the Carothers, or that O'Dea was prepared to sign the February 2012 proposed settlement agreement. Rather, Robertson counteroffered a $25,000 note, which Albertson understood to be a rejection of the proposed $38,459.62 note. Albertson testified that Robertson did not indicate O'Dea would agree to a $38,459.62 note if The Bank rejected the counteroffer. Lastly, Albertson testified:

> It was The Bank's requirement that the [proposed settlement agreement] be in writing and that The Bank be in receipt of the deed in lieu of foreclosure, the discharge of the lis pendens or proof that the lis pendens had been discharged, as well as the original recordable easement and access agreement from [the] Carothers, either through [T]he [B]ank's recording or previously recorded with the county clerk. The reason for that, for the writing requirement is that the [S]tatute of [F]rauds in New Jersey at the time required that all forbearance agreements relating to loans in excess of, I believe the amount was [one] hundred thousand dollars had to be in writing and signed by the parties who, you know, if enforcement was being sought, it had to be signed by

11

the party who was being charged. And [T]he [B]ank, obviously, wanted that in the event that there was a subsequent default in the [settlement] agreement.

The Bank's/Fulton's representative, Robert Ahrens, who negotiated with O'Dea, testified that on June 24, 2010, he sent O'Dea a "proposed framework of the settlement agreement, or workout agreement," which provided O'Dea with two scenarios. He did not recall whether O'Dea agreed to either scenario, but recalled O'Dea agreed to provide a deed in lieu of foreclosure on the South Main Street property. He testified that The Bank required all agreements with borrowers to be in writing, and there was no written agreement in this case. He also testified he was involved in between fifty and one hundred workout agreements in the course of his ten-year employment with The Bank, and all had written agreements.

In his May 5, 2016 written opinion, Judge Innes first addressed credibility and found as follows:

> Based upon the court's opportunity to observe the witnesses while they were testifying and the manner in which the witnesses testified, the court finds that Albertson and Ahrens were the more credible witnesses. Albertson and Ahrens had good recall of the events and the communications they conducted. As they have both left their former employment with The Bank and Fulton, they have no interest in the litigation.

12

Albertson especially testified clearly and cogently. He recalled his conversations with Robertson, Ahrens and Frascella. Most of the facts testified to by him were confirmed by the documentary evidence presented at trial, including the email communications.

O'Dea, on the other hand, has a substantial financial interest in this litigation. His ownership in the real property is at serious risk.

O'Dea failed to provide direct answers to the questions posed to him. He often volunteered gratuitous comments which did not ring true. For example, he testified that the original loans were done "on a handshake," when, in fact, there were loan documents executed in connection with the original $300,000 loan. He testified that his loan rate was "astronomical." When questioned by the court, he advised the court that the rate was 8%. He also testified he had paid the monies owed in connection with the Carothers settlement and obtained the discharge of the lis pendens, when in fact he had not done so. The monies were paid by plaintiff in order to facilitate the completion of the foreclosure matter. And, the bank representatives obtained the discharge of the lis pendens from the Carothers[].

It is also clear that O'Dea never disclosed the existence of the lis pendens to the bank during the negotiations. The bank only discovered the lis pendens when it ordered a title search in connection with the foreclosure of the mortgage.

Robertson seemed to have poor recollection of the events and circumstances involved in the negotiations. His recollection as to important details proved inaccurate. One example of his inaccuracy was

his testimony that O'Dea had provided the discharge of the lis pendens to the bank. It is clear to the court that the bank only obtained the discharge of the lis pendens through the efforts of Albertson in his dealings with counsel for the Carothers[].

Judge Innes then quoted the Statute of Frauds, which provides as follows, in pertinent part:

> No action shall be brought upon any of the following agreements or promises, unless the agreement or promise, upon which such action shall be brought or some memorandum or note thereof, shall be in writing, and signed by the party to be charged therewith, or by some other person thereunto by him lawfully authorized.
>
> . . . .
>
> f.    A contract, promise, undertaking or commitment to loan money or to grant, extend or renew credit, in an amount greater than $100,000, not primarily for personal, family or household purposes, made by a person engaged in the business of lending or arranging for the lending of money or extending credit. For the purposes of this subsection, a contract, promise, undertaking or commitment to loan money shall include agreements to lease personal property if the lease if primarily a method of financing the obtaining of the property;
>
> g.    An agreement by a creditor to forbear from exercising remedies pursuant

14

> to a contract, promise, undertaking or commitment which is subject to the provisions of subsection f of this section[.]
>
> [N.J.S.A. 25:1-5(f) and (g).]

The judge found the statute "clearly requires a signed writing in order for a valid 'agreement by a creditor to forbear from exercising remedies pursuant to a contract, promise, undertaking or commitment' on a commercial loan over $100,000 to be enforced." The judge noted:

> When O'Dea first entered into the loan transaction, he executed the Statement of Business Purpose. . . . In that statement, O'Dea represented and warranted that the "proceeds of the loan [would] be used in a business enterprise." As the loan in this case is a commercial mortgage in excess of $100,000, any settlement agreement calling for forbearance by the creditor is required to be in writing pursuant to the [Statute of Frauds].

The judge further found that, in addition to the requirements of the Statute of Frauds, the original mortgages required any changes to be in writing, and O'Dea reaffirmed the terms of the original mortgages when he executed the mortgage modification agreements in March 2008.

Judge Innes rejected O'Dea's reliance on McBarron v. Kipling Woods, L.L.C., 365 N.J. Super. 114 (App. Div. 2004) to support his argument that the writing requirement in the Statute of Frauds did not apply to this case. The judge

15

found McBarron involved the sale of property, and N.J.S.A. 25:1-13 provides an exception to the writing requirement for sale of real property where the party can demonstrate proof of an oral agreement by clear and convincing evidence. This case, however, involved an alleged agreement to forbear on a commercial loan in an amount over $100,000, and as such, N.J.S.A. 25:1-5(f) required a writing and an oral agreement was not binding, even if proved by clear and convincing evidence.

Judge Innes determined that even if the Statute of Frauds did not apply, O'Dea failed to prove there was a settlement agreement by clear and convincing evidence. The judge found that although the parties engaged in settlement negotiations, plaintiff always insisted that any agreement was to be in writing; the mortgage required any change to be in writing; and O'Dea testified he always expected a fully delineated written agreement at the end of negotiations. The judge concluded O'Dea failed to demonstrate the parties had a clear meeting of the minds regarding the essential terms of an agreement. The judge emphasized that O'Dea's execution of a note was an essential term throughout the negotiations, and the parties never reached an agreement on the amount of the note.

A-1016-16T1

Judge Innes also found The Bank's/Fulton's offer to accept the deed in lieu of foreclosure on the South Main Street property was conditioned on obtaining clear title to the property. Once The Bank/Fulton discovered the lis pendens, it required a discharge in order to clear title as a condition of the settlement agreement. The judge concluded that O'Dea never discharged the lis pendens and provided clear title. Instead, The Bank/Fulton obtained the discharge of the lis pendens through its own efforts.

Lastly, Judge Innes determined that, even if there was a settlement agreement, the evidence clearly showed O'Dea failed to perform his obligations thereunder. The judge found O'Dea did not perform all of his obligations to settle the Carothers' matter in a timely fashion; failed to provide the deed in lieu of foreclosure for the South Main Street property; failed to provide clear title to the property, which was a contingency of the deed in lieu of foreclosure; and did not obtain discharge of the lis pendens. Further, O'Dea provided no proof supporting his claim that he paid the Carothers $3000 for the easement and actually cleared title to the property.

In a May 20, 2016 order, Judge Innes established plaintiff's right to foreclose, suppressed O'Dea's answer and counterclaim with prejudice, entered default against O'Dea, an referred the matter to the Office of Foreclosure for

A-1016-16T1

further proceedings and entry of final judgment. The judge entered a final judgment of foreclosure on September 23, 2016. This appeal followed.

On appeal, O'Dea contends Judge Innes erred in finding he failed to prove there was a binding settlement agreement by clear and convincing evidence. O'Dea also contends the judge erred in finding he did not perform his obligations under the settlement agreement, and in ignoring The Bank's/Fulton's inequitable conduct. O'Dea further argues the judge erred in ruling the Statute of Frauds barred the settlement by misapplying N.J.S.A. 25:1-5(f) and (g) instead of N.J.S.A. 25:1-13(b), and in failing to rule that his partial performance and promissory estoppel took the settlement out of the Statute of Frauds.

Our review of a trial court's fact-finding in a non-jury case is limited. Seidman v. Clifton Sav. Bank, S.L.A., 205 N.J. 150, 169 (2011). "The general rule is that findings by the trial court are binding on appeal when supported by adequate, substantial, credible evidence. Deference is especially appropriate when the evidence is largely testimonial and involves questions of credibility." Ibid. (quoting Cesare v. Cesare, 154 N.J. 394, 411-12 (1998)). We "should not disturb the factual findings and legal conclusions of the trial judge unless [we are] convinced that they are so manifestly unsupported by or inconsistent with

18

the competent, relevant and reasonably credible evidence as to offend the interests of justice." Ibid.

We have considered O'Dea's contentions in light of the record and applicable legal principles and conclude they lack sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E). We affirm substantially for the reasons Judge Innes expressed in his comprehensive and cogent written opinion, which the record amply supports. However, we make the following brief comments.

N.J.S.A. 25:1-13(b) provides as follows, in pertinent part:

> An agreement to transfer an interest in real estate or to hold an interest in real estate for the benefit of another shall not be enforceable unless:
>
> . . . .
>
> b.    a description of the real estate sufficient to identify it, the nature of the interest to be transferred, the existence of the agreement and the identity of the transferor and the transferee are proved by clear and convincing evidence.

The statute does not apply because the transaction here was not "[a]n agreement to transfer an interest in real estate or hold an interest in real estate for the benefit of another."  Rather, the transaction was a commercial loan transaction, as clearly evidenced by the documents in the record, and the loan

19

was for an amount over $100,000 and for a business purpose.  The note had matured, the balance was due in full, O'Dea defaulted, and The Bank/Fulton refrained from proceeding with exercising its right under the note and mortgages to proceed with foreclosure by entering into settlement negotiations.  Accordingly, N.J.S.A. 25:1-5(f) and (g) applied and required the settlement agreement to be in writing.

Even if the Statute of Frauds did not apply, there was no contract in this case, either oral or implied-in-fact.  A settlement of a legal claim between parties is a contract like any other contract.  Nolan v. Lee Ho, 120 N.J. 465, 472 (1990).  As our Supreme Court held long ago,

> a contract does not come into being unless there be a manifestation of mutual assent by the parties to the same terms; and, while the manifestation of mutual assent is usually had by an offer and an acceptance either in words or by conduct, it is elementary that there can be no operative acceptance by acts or conduct unless the offeree's assent to the offer according to its terms is thereby unequivocally shown. There must . . . be an agreement – a "meeting of the minds" on the subject matter, to use a classic time-honored term, or there is no legally enforceable obligation.  An expression of assent that modifies the substance of the tender, while it may be operative as a counter-offer, is yet not an acceptance and does not consummate a contract.
>
> [Johnson & Johnson v. Charmley Drug Co., 11 N.J. 526, 538 (1953).]

"Where the parties do not agree to one or more essential terms . . . courts generally hold that the agreement is unenforceable." Weichert Co. Realtors v. Ryan, 128 N.J. 427, 435 (1992). Therefore, a settlement is not enforceable until the parties have agreed on all essential terms. Mosley v. Femina Fashions, Inc., 356 N.J. Super. 118, 126 (App. Div. 2002).

Here, the parties never agreed on an essential term of the alleged settlement agreement -- the amount of the note. The parties made offers and counteroffers of the note amount, but neither party accepted the offers. There clearly was no "meeting of the minds" regarding this essential term, and thus, no valid contract between the parties. Because there was no contract, there was no breach by The Bank/Fulton, anticipatory or otherwise.

Even if there was a contract, O'Dea breached it by failing to perform any of its terms. He did not provide The Bank/Fulton with a deed in lieu of foreclosure, clear title to the South Main Street property, or copies of the construction plans to The Bank/Fulton, and did not obtain a discharge of the lis pendens, pay $3000 to the Carothers, or obtain the easement. The record belies his claim of partial performance.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION