753 A.2d 758 (1999)
332 N.J. Super. 369
Richard H. PRANT and Heather G. Prant, Plaintiffs,
v.
Paul STERLING and Fleet Bank, N.A., Trustees under the Last Will and Testament of Peter Stuyvesant, et al., Defendants.
Superior Court of New Jersey, Chancery Division, Warren County.
Decided April 30, 1999.
Lawrence P. Cohen, Hackettstown, for plaintiffs (Courter, Kobert, Laufer & Cohen).
William D. Grand, Woodbridge, for defendants (Greenbaum, Rowe, Smith, Ravin, Davis & Himmel, LLP).
The opinion of the court was delivered by HERR, J.S.C.
In this action, plaintiffs Richard H. Prant and Heather G. Prant sought to enforce an oral agreement to purchase real estate, relying on recent amendments to the New Jersey Statute of Frauds, specifically N.J.S.A. 25:1-13b. After discovery, defendants moved for and were granted summary judgment dismissing the complaint and the lis pendens on the property, commonly known as Tranquility Farm, consisting of 588.4 acres in Alamuchy Township and 98 acres in Green Township.
The property is part of a trust (hereinafter "the Trust") created by Peter Stuyvesant, deceased, for the benefit of Diana Rivers, Paul Sterling and Sean Foley, known as "the Family" or "the Beneficiaries."
Stuyvesant's last will and testament appoint Rivers and the First National Bank of Central Jersey co-trustees. They were given equal voting power regarding issues surrounding the Trust and neither has the authority to act without the other's concurrence. The First National Bank of Central Jersey ultimately was acquired by Fleet Bank. Jane Higgins and Sharon O'Brien have served as Fleet's co-trustee representatives. Higgins, since 1992, has been responsible for the day-to-day administration of the Trust and she reported to the Private Clients Committee, (hereinafter, PCC) of Fleet Bank. O'Brien became involved in the Trust in 1997 in connection with the planned sale of Tranquility Farm and she reported to the Real Estate Administration Committee, (hereinafter, REAC) of Fleet Bank, which was required to approve all sales of real estate for which Fleet served as a trustee.
In 1993, Rivers was succeeded by her son, Paul Sterling, as the Family co-trustee. In 1995, the Trust engaged the firm of Max Spann Realty to prepare a market analysis and marketing plan for the farm. The farm was listed at a sale price of *759 $4,500,000 and Max Spann, the principal in that firm, and Earl Steves of that agency, had primary responsibility for the sale of the farm.
On or about June 30, 1997, the Trust received an offer from Plaintiff Richard Prant, to buy 500 acres of Tranquility Farm for $1,000,000 plus an exchange of 46 acres owned by Prant in Newburgh, New York.
Prant was informed that his offer was accepted and Max Spann Realtors prepared a Memorandum of Agreement to purchase, summarizing the terms of the transaction. The memorandum was in letter form and sent to Sterling and Higgins with a copy to Prant and his attorney, John Landers, Esq. The first line of the letter states: "This is to confirm our verbal understanding and document our agreement for the purchase of Tranquility Farms under the following terms."
However, the parties continued to negotiate the terms that had been set forth in the Spann memorandum after it had been received. Thereafter, a new deal was agreed to and memorialized on or about September 2, 1997, in a "summary for purchase sale agreement," which increased the purchase price to $1,050,000.
Despite the new deal, the parties continued to negotiate and on or about October 9, 1997, the parties reached their third "agreement" on the terms of the sale. Pursuant to this third agreement, Prant would purchase 512 acres of Tranquility Farm in exchange for $1,050,000, plus the 46 acre tract in Newburgh, New York. In addition, the Trust had the option to also take 17 acres in Saugerties, New York. The terms were memorialized in the form of a draft contract of sale. Neither the Trust nor Fleet ever signed the draft contract. Fleet apparently did not like this third deal due to concern that the Saugerties property was contaminated and the deal was ultimately rejected by Fleet.
Two other offers were tendered by Prant, one on November 21, 1997, and the other on November 27, 1997. Both offers were rejected by the Trust.
On December 8, 1997, Prant offered to purchase 622 acres of Tranquility Farm for $3,000,000 and on December 15, 1997, Max Spann prepared a Letter of Intent to purchase, ("Letter of Intent"). It was sent to Sterling, to Foley, to a trust attorney Michael Backer, Esq., and O'Brien and Higgins. The Letter of Intent incorporated basic terms of the deal and certain conditions. One condition was that the contract would be drawn by Fleet's trust attorney and be approved by Prant's attorney, John Landers, Esq., and signed prior to December 16, 1997.
In addition, the Letter of Intent stated that:
"The sale is subject to approval of Fleet Financial Services, Trustee for Stuyvesant Trust."
On December 18, 1997, John Sanders, Esq., sent a term sheet to Robert Schachter, Esq., an attorney for the Trust. The term sheet changed some of the basic terms in the December 15, 1997, Letter of Intent. First, the purchase price was lowered to $2,880,000. Second, a $1,000,000 deposit was required upon signing of the contract. (Again, an indication that there would be a contract to be signed.) And third, the sale was contingent upon a satisfactory Phase I environmental report.
On or about December 29, 1997, Sterling told Prant that the Stuyvesant family had agreed to go forward with the transaction. However, Sterling asserts that when he told that to Prant, the transaction he was referring to was the Letter of Intent and not the term sheet which he says he had not seen.
Sterling also wanted the contract to include a clause protecting an existing tenant and a clause requiring the closing to occur prior to May 1, 1998. However, this court accepts that Sterling had agreed to the terms, which is required on a summary judgment motion where the court must accept as true all of the facts most favorable *760 to that party opposing the motion. So, I find that indeed Sterling had indicated that the Stuyvesant family had agreed to go forward with that transaction.
On December 29, 1997, Schachter sent a draft contract consistent with the term sheet to Landers, Spann, Sterling, Foley and O'Brien. Schachter certifies that he had not spoken to Sterling or Fleet regarding the terms and had not seen or reviewed the Letter of Intent before he drafted the contract.
Moreover, he indicated that neither of the trustees had reviewed or approved the draft contract before he signed it and his letter certainly made that clear to Mr. Landers.
On December 30, Prant contacted O'Brien to request that someone from Fleet arrange to come pick up the deposit check of $950,000. He had submitted a $50,000 deposit early on in the negotiations and he wanted the balance of the $1,000,000 deposit picked up because he was leaving for Florida and it would not be convenient for him to get the money to the bank thereafter. O'Brien at that time told Prant it was premature because there had not yet been an acceptance. (O'Brien stated in her deposition that the REAC never even reviewed the draft contract.) She further testified that Prant admitted to her that he knew it was not a done deal.
When Prant arranged the delivery of the checks in an envelope, O'Brien turned the envelope over for deposit of the checks, and she did not open the envelope or inspect the checks which she sent for processing. Even though they were not signed, the three checks totaling $950,000 were deposited by Fleet in an escrow account.[1]
On December 30, 1997, Landers and Schachter spoke regarding Sterling's objection to paying up to $50,000 for any environmental clean-up or environmental study, and Schachter's comment was that he would need to "educate" Sterling. The draft contract also did not include a draft of the Declaration of Restrictions, which was a requirement of the draft contract and which would involve resolving the extent of the permitted development and how to enforce the restrictions.
While the need for a mortgage was also cited in the draft, that a draft form of mortgage was not attached doesn't seem to be a deficiency of much moment.
On January 5, 1998, Sterling informed O'Brien that the family had decided not to proceed with the sale and they wished to consummate a sale with another buyer, and on January 7, 1998, Michael Backer, Esq., a trust attorney, wrote Landers that the Trust had elected not to proceed with the sale. Landers had written Schachter seeking to "finalize the contract" on that same date.
On January 8, 1998, Prant increased his offer to $3,100,000 for the purchase of the farm. And on or about January 12, 1998, Fleet returned Prant's deposit checks.
The other buyer referenced in this case was the Nature Conservancy. Negotiations with the Nature Conservancy had begun on or about November 21, 1997. On December 16, 1997, they offered to purchase the farm for $2,750,000 and a contract to sell to the Nature Conservancy was executed on January 22, 1998.
On these undisputed facts, defendants assert, as a matter of law, they are entitled to summary judgment.
The plaintiffs assert the facts as stated most favorably for plaintiffs will prove by clear and convincing evidence that the parties had reached an agreement on the essential terms of this land sale and that this oral agreement should be enforced by the Court. In support of this position, *761 plaintiffs rely on the fact that in late December 1997, Sterling advised Prant that the offer of $2,880,000 was accepted and that O'Brien's diary entry of December 28, 1997, indicated that the deal was definite and that Sterling had advised her that the family was in agreement. However, these two factual assertions, true though they be, cannot be taken out of the context of months of negotiations that recognized there was more to the deal than Sterling's agreement to a $2,880,000 price. Clearly, all involved knew that a lengthy and detailed written and fully executed agreement would be the culmination of the negotiations.
However, plaintiffs assert the details were inconsequential and that when Landers and Schachter talked on December 30, 1997, they resolved the issue of Sterling's objection to the $50,000 in clean-up costs, and that there were only two issues which needed to be resolved following that conversation. Those issues were the amount of insurance defendants had on the buildings, which again is essentially a non-issue from the plaintiffs' perspective, and the defendants' decision concerning the restriction on the 15 acres to be donated to the school. Neither issue was brought up on oral argument.
Plaintiffs also argue that the lack of three exhibits to the draft is not evidence that a deal had not been reached. Plaintiffs assert that the exhibits were inconsequential and that while defendants' attorney, Mr. Schachter, assumed that there would be objections to the restrictions on the use of the property, no objections were discussed between Landers and Schachter on December 30, 1997.
The plaintiffs state that Prant acted in reliance on the events surrounding the draft contract by tendering the three checks to Fleet Bank and, as was stated in Landers' letter of January 8, 1998, retaining the services of Quest Environmental to conduct the environmental studies of Tranquility Farm. Prant and his wife signed the signature page of the draft contract and forwarded it to their attorney by fax on December 29, 1997, but it was not forwarded to the defendants.
Lastly, as to the defendants' claim that no agreement could be reached until REAC of the Fleet Bank approved it, plaintiffs assert that the evidence shows that REAC would approve whatever sale the family wanted approved, because REAC had approved the sale by the defendants to the Nature Conservancy and that approval was given by only three members of REAC and it was based on the review of a two-page report prepared by O'Brien which included the contract price, the identification of the property and the commission to be paid. Although Fleet Bank did require the beneficiaries to sign indemnifications and hold harmless agreements, the Bank did so apparently because of the lesser amount received from the Nature Conservancy as opposed to the Prant offer.
For all of these reasons, plaintiffs assert that the facts viewed most favorably to the plaintiffs could provide clear and convincing evidence that an agreement was reached between the parties for the sale of Tranquility Farm and therefore, defendants' request for summary judgment should be denied.
Under Rule 4:46-2, the Court shall grant summary judgment if an investigation of the merits in the pleadings, depositions and admissions on file, together with affidavits submitted on the motion, clearly shows that there is no genuine issue of material fact requiring disposition at trial. Millison v. EI du Pont de Nemours, 101 N.J. 161 at 167, 501 A.2d 505 (1985); Judson v. Peoples Bank & Trust Co. of Westfield, 17 N.J. 67, 74, 110 A.2d 24 (1954).
On a motion for summary judgment, the moving party's burden is to exclude the existence of any genuine issue of material fact. All inferences of doubt are drawn against the movant in favor of the opponent. Id. at 75-76, 110 A.2d 24.
*762 The summary judgment procedure pierces allegations contained in the pleadings to show that facts are otherwise than alleged. In essence, summary judgment is properly granted if the papers submitted with the motion palpably demonstrate the absence of any issue of material fact, even though the allegations of the pleadings standing alone may raise such an issue. Id. at 75, 110 A.2d 24.
When applying the summary judgment rule, the trial court must keep in mind two competing philosophies:
On the one hand is the desire to afford every litigant who has a bona fide cause of action or defense the opportunity to fully expose his case ... On the other hand, protection is to be afforded against groundless claims and frivolous defenses, not only to save antagonists the expense of a protracted litigation, but also to reserve judicial manpower and facilities to cases which meritoriously command attention. Robbins v. Jersey City, 23 N.J. 229, 240-41, 128 A.2d 673 (1957).
Furthermore, Rule 4:46-5A states:
When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the pleadings, but must respond by affidavits... or as otherwise provided in this rule ... must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered unless it appears from the affidavit submitted, for reasons therein stated, that the party was unable to present by affidavit, facts essential to justify opposition, in which case the court may deny the motion, may order a continuance to permit additional affidavits to be obtained, depositions to be taken or discovery to be had, or may make such other order as may be appropriate.
The summary judgment standard was further clarified in Brill v. Guardian Life, 142 N.J. 520, 666 A.2d 146 (1995):
"A dispute of fact is genuine if considering the burden of persuasion at trial, the evidence submitted by the parties on the motion, together with all legitimate inferences therefrom, could sustain a judgment in favor of the non-moving party (at 538, 666 A.2d 146) .... Under Rule 4:46-2, when deciding summary judgment motions, trial courts are required to engage in the same type of evaluation, analysis or sifting of evidential material as required by Rule 4:37-2(b), in light of the burden of persuasion that applies if the matter goes to trial." (at 539 and 540, 666 A.2d 146).
Thus, the Brill opinion makes it clear that a disputed issue of fact of an insubstantial nature should not preclude the grant of summary judgment. The present matter involves an alleged agreement for the sale of real property in which there is no agreement signed by the defendants. Historically, the Statutes of Frauds require that an agreement to transfer an interest in real property could be enforced only if there was "a writing signed by or on behalf of the party against whom enforcement is sought." N.J.S.A. 25:1-13(a). However, a recent amendment to N.J.S.A. 25:1-13(b) effective January 5, 1996, provides in pertinent part that an agreement to transfer an interest in real property shall be enforceable if:
"[A] description of the real estate is sufficient to identify it, the nature of the interest to be transferred, the existence of the agreement and the identity of the transferor and the transferee are approved by clear and convincing evidence."
No case law has been reported interpreting this section of the statute, but the report and recommendations of the New Jersey Law Revision Commission in 1991 are instructive. We are advised that:
The circumstances surrounding a transaction, the nature of the transaction, the *763 relationship between the parties, their contemporaneous statements and prior dealings, if any, are all relevant to a determination of whether the parties made an agreement by which they intended to be bound. Thus, if the parties in question have been negotiating the sale of a multi-million dollar office building over many months through the exchange of a series of redrafted written contracts, it is unlikely that the parties intended to be bound other than in writing. Conversely, if the parties in question have engaged in a series of `handshake' agreements, for the purchase and sale of individual building lots in the past and have honored them in the absence of any writing, their prior conduct could tend to show that they intended to enter into a binding oral contract.
In the present matter, defendants assert that the evidence presented does not meet the circumstances outlined by the New Jersey Law Revision Commission, and thus, plaintiffs will not be able to meet the clear and convincing standard required at trial to sustain their claim that an enforceable unwritten and unsigned agreement for the sale of Tranquility Farms was entered into. This court agrees with the defendants that there are no material issues of fact which preclude the entry of summary judgment in favor of the defendants. First, the evidence presented clearly indicates that in order for a sale of Tranquility Farm to be consummated, both the family trustee and the bank trustee were required to approve the transaction. There is no dispute that the REAC of Fleet Bank did not give its approval of the sale. While plaintiffs assert REAC would do what the family wanted, REAC was not required to do what the family wanted, and that is the dispositive fact. It is not as plaintiffs would like to frame it, that REAC was a puppet. Paul Sterling and Fleet Bank as co-trustees, with 50 percent power in each as established by the last will and testament of Peter Stuyvesant, Article 17, were required to approve the sale.
While plaintiffs argue that the proposed transaction between plaintiff Prant and defendant Trust for the sale of Tranquility Farm was approved by co-trustee Fleet Bank because O'Brien's diary entry on December 29, 1997, said that she had been informed by Sterling, that the proposed transaction with Prant was definitely approved by the beneficiaries and it would certainly happen, O'Brien did not have the power to dictate to REAC, even if they followed her advice 99 percent of the time.
Additionally, plaintiffs cite the fact that three checks for the deposit were accepted by O'Brien and placed in a bank escrow account as further evidence of approval. However, those checks were accepted at the insistence of Prant and for his convenience, and he was told by O'Brien that it was too early to make the deposit. He cannot bootstrap this accommodation made at his request by the bank into an affirmative act of acceptance of the agreement by Fleet Bank.
Second, and more compelling than these arguments which plaintiff suggest are an oral acceptance of their agreement, is the evidence that the parties intended to be bound only by a formal contract. Mr. Schachter, acting as counsel for the defendants, prepared the draft contract in accordance with plaintiffs' term sheet and forwarded it to Landers, Spann, Sterling, Foley and O'Brien. But that contract was accompanied by a letter stating that the draft contract had not been reviewed by defendants and was subject to their review. Thereafter, Landers and Schachter held a telephone conference and discussed open items, including Sterling's objection to a provision that sellers would pay up to $50,000 for environmental clean-up. Landers knew that Sterling believed the $50,000 should be zero and that Fleet wanted that term in the contract. So clearly, there was a dispute yet between the two trustees. While Schachter said he needed to "educate" Sterling to get him to agree to that $50,000, that statement is not *764 the equivalent of saying Sterling would ultimately agree. The fact that Landers in his January 7, 1998, letter wanted finalization of the contract and referred to this environmental issue and an insurance coverage issue, and whether Heather Prant would be a contract purchaser as minor modifications to the draft, does not mean agreement had been reached. On the contrary, it is compelling evidence that Landers' statement that he was concerned to finalize the contract meant that there was not yet a contract or an agreement between the parties.
More precisely, it is evidence that leads this court to the conclusion that the parties only intended to be bound by a formal written contract signed by all the parties. Of course, defendants also point to Paragraph 5.5B of the draft contract requiring a Declaration of Restrictions which could obviously raise other issues to be resolved between these parties and likewise create opportunities to fail to reach agreement.
I conclude that there are no issues of material fact which preclude granting summary judgment to the defendants. Defendants have proven that plaintiffs have not and cannot establish by clear and convincing evidence at trial, even taking all of the facts most favorably to the plaintiffs, that the parties herein intended to be bound by the draft contracts, or that these drafts included all the terms essential to the expectations of both the buyer and the sellers for the sale of Tranquility Farm.
Defendants are granted summary judgment dismissing all of plaintiffs' claims and also are granted a discharge of the lis pendens that has been filed.
NOTES
[1] The fact that Prant did not sign his checks raises an interesting issue whether if at some point Prant had gotten disenchanted with the deal, he would argue that he had the right to have them returned, because they didn't really mean anything because they weren't signed.