827 A.2d 352

FREDERICK A. MORTON, JR., PLAINTIFF–APPELLANT, v. 4 ORCHARD LAND TRUST, DEFENDANT–RESPONDENT.

Superior Court of New Jersey
Appellate Division

Argued March 17, 2003—Decided July 21, 2003.

Before Judges A.A. RODRÍGUEZ, WELLS and PAYNE.

*Robert A. Wayne* argued the cause for appellant (*St. John & Wayne,* attorney; *Bryant K. Aaron and Mr. Wayne,* on the brief).

*Michael P. DeMarco* argued the cause for respondent (*DeMarco & DeMarco,* attorneys; *Mr. DeMarco,* on the brief).

The opinion of the court is delivered by

RODRÍGUEZ, A.A., J.A.D.

Frederick A. Morton, Jr., sought to purchase real property at Orchard Court in Montclair from the 4 Orchard Land Trust (Trust). A form of contract was prepared by a broker and signed by Morton. After extensive review and negotiations, the attorneys for both parties approved the terms. The Trustees orally agreed to the deal, but then decided to accept another offer. Therefore, they did not sign the contract. Morton brought this action to compel the sale of the property to him. One of his arguments is that the 1996 amendment to the statute of frauds, *N.J.S.A.* 25:1–13, trumps the attorney review procedure outlined in *New Jersey State Bar Ass'n v. New Jersey Ass'n of Realtor Bds.,* 93 *N.J.* 470, 476, 461 *A.*2d 1112 (1983) (modified 94 *N.J.* 449, 467 *A.*2d 577 (1983)), and *N.J.A.C.* 11:5–6.2(g)(2). We reject this contention and affirm the trial court's dismissal of the complaint.

Beginning early in 2000, Laurena White, a real estate agent and realtor associate for Schweppe & Co. (Schweppe), had been searching for an appropriate home in the Montclair area for Morton. Morton also did some searching on his own. He discovered a new construction development named Paddock Farms in West Orange. He signed a contract to purchase real property at Paddock Farms.

In the meantime, the Orchard Court property was listed for sale. White notified Morton about it. He was very interested in seeing it. White contacted the Trustees directly and learned that

one offer above the listing price had already been received, and that two more offers were expected. On July 26, 2001, White learned that an offer had been accepted, but the Trustees indicated that Morton could make an offer during that competing purchaser's (Buyer # 1) three-day attorney review period. Morton saw the property and immediately instructed White to make an offer, and if his offer was accepted, he would terminate the Paddock Farms contract. The offer was accepted.

On July 31, 2001, Morton signed a broker-prepared contract with a purchase price of $625,000. Paragraph 22 of the proposed contract set out the terms of the standard attorney review clause. Early the next day, August 1, 2001, at White's suggestion, Morton improved his purchase price offer to $635,000. A copy of the offer was also forwarded to Morton's attorney and a mortgage broker. The mortgage broker issued a mortgage commitment that day. This commitment was forwarded by White to the Trustees. During two conversations on August 1 and 2, 2001, White learned that Morton's offer was very attractive to the Trustees. However, acceptance would not be forthcoming until Buyer # 1's contract for the purchase of the Orchard Court property could be "un-hooked." As described by White, the following occurred:

> Later in the afternoon of August 2, the [Trustees] informed me that they were able to get out of the deal with Buyer # 1 and that Mr. Morton's offer was accepted. This, to me, of course meant that the owner had formally terminated the deal with Buyer # 1. The [Trustees] further stated that an 'attorney review' letter would be coming the same day from their attorney to Mr. Morton's attorney. [The Trustees] also expressed a desire, if we would accommodate it, to complete attorney review by Friday, August 3—before their attorney, Frank Catania, Esq., left for his vacation.

After calling to inform Morton and his attorney that the offer had been accepted, White called the Trustees again to obtain a copy of the signed agreement. The Trustees told White that "they would take care of that detail later." White believed that this meant the "detail" of sending her a copy of the signed agreement. According to White, the Trustees always gave her the "impression that the contract had been signed by them."

On Thursday, August 2, 2001, in a letter to Morton's attorney, Catania wrote that he represented the Trust regarding the real estate transaction involving the Orchard Court property. The letter stated:

> After review of the Contract in this regard, I find same to be acceptable provided the following changes and/or modifications are made thereto. [four changes are listed] . . .
>
> Upon receipt, please review the above with the Buyer and advise if acceptable. In the event I do not hear to the contrary by the close of business on August 6, 2001, I will take the position that same is acceptable and the attorney review period concluded.

The following day, Catania again wrote to Morton's attorney, stating that "as a follow up to my review letter," the Trustees required an additional modification, namely that Morton would agree to accept the premises with the present occupant in place and that it would be Morton's responsibility to have that occupant removed.

Morton accepted all of these conditions. He arranged to terminate the Paddock Farms contract. However, the Trustees then did an "about face." In a letter dated August 3, 2001, Catania wrote to Morton's attorney that:

> I just received notification from the [Trustees] that they have elected to exercise their rights under Paragraph 22 of the Contract of Sale and declare the within transaction null and void. Accordingly, neither party shall have any further liability to one another.

The letter authorized the release of any deposit monies to Morton.

Morton called White on August 6, 2001 and told her about the termination letter. White called the Trustees to discuss the attempted termination. She was informed that Buyer # 1 had improved his offer. White discussed with Morton whether to raise his purchase price offer. After reviewing this situation with his attorney, Morton and White concluded that the purported termination letter was without effect and that, instead of raising his purchase price again, Morton had every right to stand on his contract. Therefore, Morton's attorney wrote to Catania that the changes set forth in the August 2 and 3, 2001 letters "are acceptable to my client. Your letter dated August 3, 2001 pur-

porting to terminate the Contract is ineffective notice pursuant to paragraph 22 of the Contract."

Morton filed this action for specific performance and sought an order to show cause with injunctive relief. Morton also filed a notice of *lis pendens*. Judge Kenneth S. Levy, signed the order to show cause but denied the injunction pending the return date.

The Trust moved to dismiss the complaint for failure to state a claim. Morton moved to amend the complaint to name White and Schweppe as additional plaintiffs. Following a hearing, Judge Levy denied the preliminary injunction, dismissed the complaint, discharged the *lis pendens* and denied the motion to amend the complaint.

Morton moved for a stay pending appeal. The Trust's attorney revealed that the closing with Buyer # 1 had taken place the day before. The judge granted a stay pending appeal. Morton moved unsuccessfully for a re-hearing and reconsideration and for imposition of contempt sanctions against the Trustees and/or its attorneys for having sold the property prior to the return date. The judge denied the motions for reconsideration and to impose sanctions.

On appeal, Morton's first four contentions focus on the attorney review procedure. The contentions are:

I. *Whether under N.J.A.C. 11:5–6.2(G)(2), "Delivery" of a "Signed agreement" to a party to a realtor-drawn contract is necessary to commence the attorney review period where (as here) it is clear that the parties have in fact engaged in attorney review.*

II. *If, under N.J.A.C. 11:5–6.2(G)1 'delivery' of a signed agreement is required to commence attorney review under these circumstances, then the regulation collides with the statute of frauds, [N.J.S.A. 25:1–13(b) as amended in 1996] and is void as a matter of law under Carmagnola v. Hann.*[1]

III. *If under N.J.A.C. 11:5–6.2(G)(2), attorney review never commenced, the [Trust's] ineffective termination letter was an anticipatory breach of the contract giving Mr. Morton the right to either cancel or enforce the contract.*

IV. *The [Trust's] failure to comply with the contractual method of providing termination notice is a material breach of the contract and not 'hyper technical;'.*

[1] 233 *N J.Super.* 547, 559 A.2d 478 (App.Div.1989).

■ We find that framing the issues in terms of the attorney review procedure is not helpful. From our careful review of the record, we conclude that the procedure outlined in *State Bar Ass'n* and *N.J.A.C.* 11:5–6.2(g)1 and 2, is not relevant to the resolution of this case. The attorney review procedure is triggered upon delivery of a fully-executed, broker-prepared contract to Morton and the Trust. *State Bar Ass'n, supra,* 93 *N.J.* at 476, 461 *A.*2d 1112, *N.J.A.C.* 11:5–6.2(g)1 and 2; *Peterson v. Estate of Pursell,* 339 *N.J.Super.* 268, 273–74, 771 *A.*2d 666 (App.Div.2001). Here, a contract was never executed by both sides. Therefore, the issue is not whether an existing contract was disapproved or terminated pursuant to its attorney review clause. Rather, the issue is whether Morton's contract for the purchase of the Orchard Court property ever came into existence. We conclude that it did not.

■ The attorney review procedure outlined in *State Bar Ass'n* and *N.J.A.C.* 11:5–6.2(g) is not a prerequisite *to enter into a contract* prepared by a broker. *Gordon Development Group, Inc. v. Bradley,* 362 *N.J.Super.* 170, 198, 827 A.2d 341, 2003 WL 21673003 (App.Div.2003). (emphasis added). Rather, it is a mechanism by which an *existing* broker-prepared contract is terminated pursuant to its own terms. *Ibid.* (emphasis added). Once the attorney for the parties to a broker-prepared contract approve the document, the attorney review clause is satisfied, even if the three-day period has not expired. *Romano v. Chapman,* 358 *N.J.Super.* 48, 56, 816 *A.*2d 1080 (App.Div.), *certif. denied,* 176 *N.J.* 431, 824 *A.*2d 159 (2003). However, mutual approval by the attorneys cannot create a contract where both parties have not executed the document.

Here, there was: a proposed, broker-prepared contract; approval by both attorneys; and execution by Morton. However, because the seller did not execute the proposed contract, an agreement never came into existence. Therefore, Morton's "ineffective termination (Contention III)" and "failure to comply with the contractual method (Contention IV)" are moot issues. These issues are predicated on the existence of a contract.

Morton alleges that a binding oral contract was formed here. We disagree. The statute of frauds, *N.J.S.A.* 25:1–13 provides at present:

> An agreement to transfer an interest in real estate or to hold an interest in real estate for the benefit of another shall not be enforceable unless:
>
> a. a description of the real estate sufficient to identify it, the nature of the interest to be transferred, the existence of the agreement, and the identity of the transferor and transferee are established in a writing signed by or on behalf of the party against whom enforcement is sought; or
>
> b. a description of the real estate sufficient to identify it, the nature of the interest to be transferred, the existence of the agreement and the identity of the transferor and the transferee are proved by clear and convincing evidence.

Subsection b represents the amendment that became effective in January 1996. L.1995 c. 360 § 4.

In *Prant v. Sterling,* 332 *N.J.Super.* 292, 753 *A.*2d 715 (App.Div. 2000). We held that "[b]y reason of this provision, the acquisition of an interest in land may be established by parol evidence for the first time in modern history." *Id.* at 293, 753 *A.*2d 715. In that case, the Chancery Division judge found that the report and recommendations of the New Jersey Law Revision Commission in 1991 were instructive, providing the following:

> The circumstances surrounding a transaction, the nature of the transaction, the relationship between the parties, their contemporaneous statements and prior dealings, if any, are all relevant to a determination of whether the parties made an agreement by which they intended to be bound. Thus, if the parties in question have been negotiating the sale of a multi-million dollar office building over many months through the exchange of a series of redrafted written contracts, it is unlikely that the parties intended to be bound other than in writing. Conversely, if the parties in question have engaged in a series of 'handshake' agreements, for the purchase and sale of individual building lots in the past and have honored them in the absence of any writing, their prior conduct could tend to show that they intended to enter into a binding oral contract.
>
> [*Prant v. Sterling,* 332 *N.J.Super.* 369, 378, 753 *A.*2d 758 (Ch.Div.1999)]

In *Prant,* the trial court determined that the evidence did not meet the circumstances outlined above, and thus, that there was no clear and convincing proof of the existence of an agreement for the sale real property. *Ibid.* There was compelling evidence that the parties intended to be bound only by a formal contract. *Id.* at 379–80, 753 *A.*2d 758.

Here, it is equally compelling that the parties intended to be bound only by a formal written contract, not by an oral agreement. A proposed contract, signed by Morton, was forwarded to the Trust's attorney. This proposed contract was the subject of review and approval by both attorneys. There is no hint that a written document was unnecessary and that the oral agreement communicated by the Trustees to White was intended to bind the parties. In short, the undisputed evidence shows that: the parties intended to enter into a written contract; the attorneys agreed on the terms; but the Trustees repudiated the transaction before executing the written contract. The amended statute of frauds does not advance Morton's cause. There was no written or oral contract.

Morton contends that because the statute of frauds no longer requires a written and signed document to prove the existence of an agreement for the sale of land, a written and signed document could not be required to commence attorney review in the present circumstances. We disagree. We are mindful that when a regulation conflicts with a statute, the regulation is void as a matter of law. *Carmagnola v. Hann*, 233 *N.J.Super.* 547, 559 A.2d 478, (App.Div.1989). However, here we find no conflict between the statute of frauds and the regulation.

Moreover, Morton's argument that the statute of frauds as amended trumps the *State Bar Ass'n*, consent order and *N.J.A.C.* 11:5-6.2(g)1 and 2 is misplaced. The statute of frauds establishes an alternative method to prove the existence of an enforceable contract for the transfer of an interest in real estate. This covers all real estate transactions, including commercial transactions and conveyances not involving real estate brokers. The *State Bar Ass'n* consent judgment and the regulation are designed to govern a specific type of contract, those prepared by realtors. Nothing about the amendment to the statute of frauds evidences an intention on the part of the Legislature to undo the very carefully crafted solution, approved by the Supreme Court, to dissipate the tensions between attorneys and realtors created by broker-pre-

pared contracts. Absent a more specific expression of legislative intent, we have no warrant to declare that the Legislature intended to obliterate the attorney review procedure by amending the statute of frauds.

Morton also contends that the judge erred by failing to impose sanctions on the Trust for closing on the Orchard Court property before the return date of the order to show cause. Morton alleges that the Trust's counsel represented that this would not occur.

The judge found that the Trust did not represent that it would not sell the subject property prior to the return date. The Trust's attorney suggested that no title insurance company would permit a closing while a notice of *lis pendens* was of record. The attorney also said that the Trust "had no firm closing date."

We find no abuse of discretion in Judge Levy's decision not to impose sanctions. From our review of the record we conclude that the judge did not issue the injunction against selling the property because the judge was not satisfied that Morton was likely to succeed, not because the Trust induced him to rely on its representations.

Morton's final contention is that,

> In finding for the [Trust] the trial court improperly raised the standard for injunctive relief and lowered the standard for summary judgment and discharge of *lis pendens*.

We determine that this contention is clearly without merit and that an opinion would have no precedential value. *R.* 2:11–3(e)(1)(E).

Affirmed.