849 A.2d 164

FREDERICK A. MORTON, JR., PLAINTIFF–APPELLANT, v. 4 ORCHARD LAND TRUST, DEFENDANT–RESPONDENT.

Argued February 19, 2004—Decided June 9, 2004.

*Robert A. Wayne* argued the cause for appellant (*St. John & Wayne*, attorneys; *Mr. Wayne* and *Bryant K. Aaron*, of counsel and on the brief).

*Michael P. De Marco* argued the cause for respondent (*De Marco & De Marco*, attorneys).

Justice ALBIN delivered the opinion of the Court.

This appeal concerns whether the parties entered into a contract for the sale of real property. The buyer claims that there was a legally enforceable agreement, whether written or oral, and that the seller breached its provisions. The Appellate Division affirmed the Chancery Division's grant of summary judgment dismissing the buyer's complaint. We agree with the courts below that the contract was missing an essential element—a meeting of the minds on the terms of the agreement.

## I.

At this juncture, we present the facts, as we must, in the light most favorable to plaintiff to determine whether the grant of summary judgment in favor of defendant was appropriate. *R.* 4:46–2(c); *Brill v. Guardian Life Ins. Co. of Am.*, 142 *N.J.* 520, 540, 666 *A.*2d 146 (1995). Plaintiff Frederick A. Morton, Jr., was interested in purchasing a house in the Montclair area and engaged the services of Laurena White (the realtor), a real estate agent for Schweppe & Co. The Trustees of defendant 4 Orchard Land Trust listed for sale a five-bedroom home located at 4 Orchard Court in Montclair. On July 24, 2001, the realtor contacted the Trustees and scheduled an appointment for plaintiff to view the property. After plaintiff toured defendant's property on July 29, he authorized the realtor to submit an offer. By that time, however, the realtor was advised by the Trustees that defendant had entered into a contract to sell the property to another buyer. Nevertheless, the Trustees said that defendant would entertain additional offers while the contract was under

attorney review. On July 31, the realtor forwarded to defendant a signed broker-prepared real estate contract with the signatures of both the realtor and plaintiff, offering $625,000 for the Orchard Court property. On August 1, plaintiff increased his bid to $635,000, and submitted the change on the same broker-prepared contract forwarded the day before.

The broker-prepared contract represented that it was the sole agreement between the parties "who sign it" and that there were "[n]o representations" made by the parties other than those set forth in the agreement. The contract also included a standard attorney review clause in paragraph 22 that provided for the commencement of a three-day attorney review period after "delivery of the signed Contract to the Buyer and Seller." Under the provisions of that clause, at the end of the three-day review period, the contract would be legally binding unless the attorney for the buyer or seller disapproved of the contract. Paragraph 22 required that the attorney disapproving of the contract "notify the REALTOR®(S) and the other party named" within the three-day period and that the method of delivery of "the notice of disapproval to the REALTOR®(S) [be] by certified mail, by telegram, or by delivering it personally."

On August 2, the Trustees informed the realtor that "they were able to get out of the deal with [the original buyer]," that plaintiff's offer was accepted, and that plaintiff's attorney would receive an attorney review letter that day. Later that day, defendant's attorney, Frank Catania Jr. (defendant's attorney), sent a letter via facsimile to plaintiff's attorney, Eric Pennington (plaintiff's attorney), stating:

> After review of the Contract in this regard, I find same to be acceptable *provided the following changes and/or modifications are made* thereto.[1]

---

[1] In the letter, defendant's attorney insisted on four changes to the contract:
1) Line "97"; delete "actual costs" and insert "$750.00";
2) Item 9. The items shall be in their "as is" condition;
3) All contingency periods in Paragraphs 19 & 20 shall commence upon the date hereof; and

. . .

Upon receipt, please review the above with the Buyer and advise if acceptable. In the event I do not hear to the contrary by the close of business on August 6, 2001, I will take the position that same is acceptable and the attorney review period concluded.

[ (Emphasis added.) ]

That same day, the realtor informed both plaintiff and Penny Codrington, a partner of Mr. Pennington (also referred to as plaintiff's attorney), that the offer had been accepted. The realtor also spoke with the Trustees and requested a copy of the real estate contract signed by defendant. The Trustees replied that "they would take care of that detail later." Neither plaintiff nor any of his representatives ever received a contract signed by defendant.

On August 3, defendant's attorney sent a second faxed letter to plaintiff's attorney, further modifying the contract to require that plaintiff "accept the premises with the present occupant in place" and to impose on plaintiff the "responsibility" of removing the "occupant." The letter requested plaintiff's attorney to "kindly advise as to [plaintiff's] position with respect to the above as well as the requested changes of August 2nd." That same day, before receiving a response from plaintiff, defendant's attorney faxed yet a third letter to plaintiff's attorney, stating that, pursuant to "Paragraph 22 of the Contract of Sale," his client exercised the option to declare the "transaction null and void." The letter contained the notation "CC: Schweppe & Co. (via fax[) ]," signifying that a copy was forwarded to the realtor's agency. The realtor denied ever receiving the letter.

On August 6, plaintiff learned from his attorney that defendant had disavowed the contract and, from his realtor, that the original buyer had submitted a higher offer. Plaintiff was informed by his attorney that the letter of withdrawal was "without effect" because

---

4) An additional paragraph shall be added to read: "The Seller shall order title on behalf of the Buyer through Carroll Title Agency on behalf of Old Republic Title Insurance Co. in the amount of the purchase price and the parties shall split the total cost of premium at time of closing."

defendant's attorney did not comply with the contract's attorney review clause, which required that the letter be delivered to the realtor by certified mail, telegram, or personal delivery. Plaintiff's attorney took the position that the attorney's receipt of the letter withdrawing the offer did not comply with the broker-prepared contract that defendant never signed. Based on his attorney's advice, plaintiff decided not to increase his offer, and instead, instructed his attorney to accept the proposed changes to the contract contained in the August 2 and August 3 letters from defendant's attorney. On August 6, in accordance with those instructions, plaintiff's attorney sent the following letter to defendant's attorney via facsimile and certified mail:

> Please be advised that the changes to the above-referenced contract set forth in your attorney review letters dated August 2, 2001 and August 3, 2001 are acceptable to my client. Your letter dated August 3, 2001 purporting to terminate the Contract is ineffective notice pursuant to paragraph 22 of the Contract.
>
> This letter confirms the conclusion of the attorney review period and my client's acceptance of a binding contract which we intend to enforce.[2]

In a response letter, defendant's attorney maintained that there was "no pending transaction" between the Trustees and plaintiff for the sale of the Orchard Court property. On August 8, 2001, plaintiff's attorney sent a second letter, again stating that the notice of termination was defective because it had been sent by facsimile. In reply, defendant's attorney stated that the Trustees never signed the contract and, therefore, there was no binding agreement between the parties.

Thereafter, plaintiff filed a complaint seeking specific performance of the contract and a temporary restraining order prohibiting the Trustees from selling the Orchard Court property pending a hearing. The trial court denied the issuance of a temporary

---

[2] At oral argument, plaintiff's attorney asserted that there was a factual dispute that required summary judgment to be denied. Plaintiff's attorney represented that plaintiff had accepted the conditions set forth in defendant's counter-proposals of August 2 and August 3, before receiving defendant's August 3 letter withdrawing the offer. That representation is directly contradicted by plaintiff's own certification, the realtor's certification, and Mr. Pennington's August 6 letter to defendant's attorney.

restraining order, but required the Trustees to show cause why they should not be prevented from selling the Orchard Court property.

Plaintiff then filed a notice of *lis pendens* to protect his "interest" in the Orchard Court property and, in response, the defendant filed a motion to dismiss the complaint for failure to state a claim upon which relief could be granted and to discharge the *lis pendens*. Following a hearing, the Chancery Court treated defendant's failure to state a claim motion as a summary judgment motion, and then granted summary judgment and discharged the *lis pendens*. The court stayed its judgment pending plaintiff's appeal, but by then the Orchard Court property had been sold to the original buyer.

The Appellate Division upheld the grant of summary judgment in favor of defendant, finding that the parties never had entered into a contract because defendant never signed the broker-prepared real estate contract. *Morton v. 4 Orchard Land Trust*, 362 *N.J.Super.* 190, 196, 827 *A.*2d 352 (2003). The panel rejected plaintiff's claim that an oral contract had been formed, concluding that "the parties intended to be bound only by a formal written contract, not by an oral agreement." *Id.* at 198, 827 *A.*2d 352.

We granted plaintiff's petition for certification, 178 *N.J.* 251, 837 *A.*2d 1094 (2003), and now affirm.

## II.

Plaintiff contends that he entered into an enforceable oral agreement to purchase real property from defendant and that the agreement complied with the requirements of the Statute of Frauds, *N.J.S.A.* 25:1–13b. Plaintiff asks this Court to hold that his realtor, who prepared a written contract of sale to be signed by both parties for the purchase of the Orchard Court property, consummated the deal with defendant pursuant to an oral agreement. Plaintiff also posits that there is a conflict between the Statute of Frauds, which sanctions oral agreements for the sale of real estate, and this Court's requirement that broker-prepared

real estate contracts be signed by the parties.[3] *See N.J. State Bar Ass'n v. N.J. Ass'n of Realtor Bds.*, 93 N.J. 470, 472, 475, 461 A.2d 1112 (1983) (requiring use of standard attorney review clause in all broker-prepared real estate contracts pursuant to constitutional authority to govern practice of law, *N.J. Const.* art. VI, § 2, ¶ 3). Plaintiff argues that any conflict between the Statute of Frauds and our decision in *New Jersey State Bar Ass'n v. New Jersey Ass'n of Realtor Boards* must be resolved in favor of the statute. Because we conclude that the parties never entered into an oral or written agreement for the sale of the Orchard Court property, we will not address the hypothetical conflict issue raised by plaintiff.

Before the recent amendments to the New Jersey Statute of Frauds, *L.* 1995, *c.* 360, the law in this State for centuries required that an agreement for the sale of an interest in land had to be reduced to writing. New Jersey Law Revision Commission, *Report and Recommendations Relating to Writing Requirements for Real Estate Transactions, Brokerage Agreements and Suretyship Agreements* 2 (1991) [hereinafter *Final Report* ]. In the early 1990s, the New Jersey Law Revision Commission (the Commission) came to the conclusion that the Statute of Frauds was "in need of in-depth revision" to bring it in accord with modern practice.[4] *Id.* at 1. In 1996, in response to the Commission's *Final Report,* the Legislature enacted *N.J.S.A.* 25:1–13, which, for the first time, permitted enforcement of an oral agreement to sell an interest in real estate. The statute provides:

An agreement to transfer an interest in real estate or to hold an interest in real estate for the benefit of another shall not be enforceable unless:

---

[3] That both parties must *sign* the broker-proposed contract follows from the language of *New Jersey State Bar Ass'n v. New Jersey Ass'n of Realtor Bds.*, 93 N.J. 470, 476, 461 A.2d 1112 (1983) and *N.J.A.C.* 11:5–6.2(g)(2), requiring that the three-day attorney review period does not begin until "delivery of the *signed* contract to the Buyer and Seller." (Emphasis added.)

[4] Before passage of *L.* 1995, *c.* 360, § 4, "a contract for sale of real estate, or any interest in or concerning the same" was unenforceable unless "in writing, and signed by the party to be charged." *N.J.S.A.* 25:1–5d (deleted by amendment).

a. a description of the real estate sufficient to identify it, the nature of the interest to be transferred, the existence of the agreement, and the identity of the transferor and transferee are established in a writing signed by or on behalf of the party against whom enforcement is sought; or

b. a description of the real estate sufficient to identify it, the nature of the interest to be transferred, the existence of the agreement and the identity of the transferor and the transferee are proved by clear and convincing evidence. [*N.J.S.A.* 25:1–13.]

In its commentary on the proposed *N.J.S.A.* 25:1–13b, the Commission stated that "the focus of inquiry in a situation involving an agreement for the sale of an interest in real estate . . . should be whether an agreement has been made between the parties by which they intend to be bound." *Final Report, supra,* at 10. According to the commentary, when an agreement has not been reduced to writing, a "high standard of proof" must be met to establish that intent. *Ibid.* Specifically, "the existence of an [oral] agreement between the parties as well as its essential terms must be proved by clear and convincing evidence." *Ibid.* The Commission stated that, "[t]he circumstances surrounding a transaction, the nature of the transaction, the relationship between the parties, [and] their contemporaneous statements and prior dealings, if any, all are relevant to a determination of whether the parties made an agreement by which they intend to be bound." *Ibid.* As guidance, the Commission gave examples of situations when parties would intend to be bound only by a written agreement and when parties would intend to be bound by an oral agreement:

[I]f the parties in question have been negotiating the sale of a multi-million dollar office building over many months through the exchange of a series of redrafted written contracts, it is unlikely that the parties intended to be bound other than in writing. Conversely, if the parties in question have engaged in a series of "handshake" agreements for the purchase and sale of individual building lots in the past, and have honored them in the absence of any writing, their prior conduct could tend to show that they intended to enter into a binding oral agreement. [*Ibid.*]

Although we have not had occasion to construe *N.J.S.A.* 25:1–13, our analysis is informed by how other courts have applied that statute in different factual settings. In *Prant v. Sterling,* 332 *N.J.Super.* 369, 370, 371–74, 378–80, 753 *A.*2d 758 (1999), *aff'd o.b.,*

332 *N.J.Super.* 292, 753 *A.*2d 715 (App.Div.2000), the Chancery Division found that the parties did not enter into an oral contract of sale pursuant to *N.J.S.A.* 25:1–13b and, therefore, granted summary judgment to the seller in a complicated real estate transaction involving hundreds of acres of land, valued in the millions of dollars. The parties in that case had engaged in months of negotiations during which they proposed and rejected several draft written agreements. *Id.* at 371–74, 753 *A.*2d 758. The buyers claimed that one of the co-trustees of the trust that owned the land orally accepted an offer, thus forming an enforceable contract of sale. *Id.* at 375, 753 *A.*2d 758. The trial court found that the trustee's oral acceptance of the basic terms of the agreement could not "be taken out of the context of [the] months of negotiations that recognized there was more to the deal than [the trustee's] agreement to a [purchase] price" and that "all involved knew that a lengthy and detailed written and fully executed agreement would be the culmination of the negotiations." *Ibid.* After reviewing *N.J.S.A.* 25:1–13b and the commentary of the Commission, the court held that the buyers did not "meet the clear and convincing standard required at trial to sustain their claim that an enforceable unwritten and unsigned agreement for the sale of [land] was entered into," *id.* at 378, 753 *A.*2d 758, because the history of the parties' dealings revealed that they "intended to be bound only by a formal contract," *id.* at 379, 753 *A.*2d 758.

In contrast, in *McBarron v. Kipling Woods L.L.C.*, 365 *N.J.Super.* 114, 115–16, 838 *A.*2d 490 (2004), the Appellate Division reversed the trial court's grant of summary judgment in favor of a seller who withdrew from an agreement, finding that an issue of material fact was raised concerning whether the seller intended to be bound by an oral contract of sale for real estate. In *McBarron,* the buyers, a husband and wife, brought an action to enforce an oral contract to purchase a lot on which they intended to build a home. *Id.* at 115, 118, 838 *A.*2d 490. The buyers claimed that the oral agreement to purchase the property for $185,000 was formed during telephone conversations with Barry Jost, who was

representing the seller, Kipling Woods, L.L.C. *Id.* at 118, 838 *A.*2d 490. The telephone conversations were the culmination of a long course of dealings between the parties that began in 1998. *Id.* at 117, 838 *A.*2d 490. On November 2, 2001, Jost called the husband at work and told him that the purchase price of the lot was $185,000. *Id.* at 118, 838 *A.*2d 490. The husband accepted and asked if the transaction was a "done deal," to which Jost replied, "definitely." *Ibid.* Jost told the husband that he and his wife were "like family" and that the seller's attorney would "draw up" an agreement. *Ibid.* Before the end of the telephone conversation, Jost assured him that "the deal was done." *Ibid.* Four days later, Jost called the husband and advised him that a builder-friend had offered $190,000 for the lot. *Ibid.* Jost, however, did not attempt to breach the agreement, acknowledging that they "had a deal" and he would "honor it." *Ibid.* Jost added that he had explained to his friend that the husband and wife were the "contractual owners" of the property. *Ibid.* On November 13, Jost called the husband yet again, but this time "began to renege on the agreement" because he had received a significantly higher offer by a corporate entity that was purchasing a number of lots at Kipling Woods. *Ibid.* The husband tape-recorded the conversation during which Jost repeatedly confirmed that they had a deal. *Id.* at 118–19, 838 *A.*2d 490. Nevertheless, Jost abandoned the buyers, who then filed an action to enforce the agreement. *Id.* at 115, 119, 838 *A.*2d 490. The appellate panel noted that "the mere anticipation of a written memorialization of an oral agreement," provided that all the elements of a contract are present, "does not as a matter of law vitiate an oral contract." *Id.* at 116, 838 *A.*2d 490. The panel concluded that the buyers' proofs, if credited by a trier of fact, would support by clear and convincing evidence a finding that the parties had entered into an oral contract for the sale of the lot. *Id.* at 119, 838 *A.*2d 490.

In this case, we cannot find the existence of a contract even in the deferential light in which we must view the facts as presented by plaintiff. From the inception of the dealings be-

tween the parties, beginning with the broker-prepared contract, to the final flurry of letters between the attorneys, it is clear to us that plaintiff and defendant intended to be bound only by a written contract. Under the terms of the written contract prepared by plaintiff's realtor, the contract was binding only on "parties who *sign* it," and the "*signed* contract" had to be delivered to the parties. (Emphasis added.) The realtor and plaintiff signed the contract, but defendant did not. The realtor contemplated that defendant would forward to her a signed copy to consummate the deal.

Even by the most indulgent standard, we do not believe that a reasonable trier of fact could accept the claim that the parties agreed to be bound by an oral contract based on the August 2 conversation between the plaintiff's realtor and the Trustees. According to the realtor, the Trustees said that they accepted plaintiff's offer in the broker-prepared contract and that defendant's attorney would forward a letter to plaintiff's attorney that day. The letter received by plaintiff's attorney from defendant's attorney that same day was not an unqualified acceptance of the terms of the broker-prepared agreement, but a counteroffer. Realtors customarily make a written offer and expect to receive a signed, written acceptance. The Trustees' few words of general acceptance of the terms followed immediately by a letter from defendant's lawyer making a counter-proposal is hardly suggestive of a course that would end in a mere verbal agreement. Moreover, the next day, defendant's attorney forwarded a second letter placing yet a further condition (acceptance of present occupant on the premises) on the sale of the property. That same day, defendant's attorney withdrew the offer to sell to plaintiff before plaintiff issued a response.

The method of notification by defendant's attorney was not governed by the attorney review clause because defendant never signed the broker-prepared agreement or manifested any intent to be bound by it. A written contract is formed when there is a "meeting of the minds" between the parties evidenced by a

written offer and an unconditional, written acceptance. *Johnson & Johnson v. Charmley Drug Co.*, 11 *N.J.* 526, 538–39, 95 *A.2d* 391 (1953). Here, there was none. Additionally, the letters from defendant's attorney did not form a written agreement because a counteroffer only ripens into a valid contract if accepted prior to revocation. *Id.* at 538, 95 *A.2d* 391 ("An expression of assent that modifies the substance of the tender, while it may be operative as a counter-offer, is yet not an acceptance and does not consummate a contract."); Milton R. Friedman & James Charles Smith, *Friedman on Contracts and Conveyances of Real Property* § 1.2 (2002) ("The common-law 'mirror image' rule requires that the acceptance precisely match the offer."); *see also Trustees of First Presbyterian Church v. Howard Co. Jewelers*, 12 *N.J.* 410, 413, 97 *A.2d* 144 (1953) (stating that prior to acceptance "either party is at liberty to withdraw his consent").

We also find that there is no compelling proof—proof by clear and convincing evidence—that defendant manifested an intent to enter into an oral agreement for the sale of the Orchard Court property. *See N.J.S.A.* 25:1–13b. In this case, a binding, oral agreement is not suggested by the circumstances surrounding the negotiations, or by the relationship of the parties, or by the parties' contemporaneous statements and past dealings. This case is similar to *Prant*, in which the initial offer was in writing as were all meaningful communications between the parties, leading to one inescapable conclusion—the parties did not intend to be bound by an oral agreement. *See Prant, supra*, 332 *N.J.Super.* at 371–74, 753 *A.2d* 758. The sale of the Orchard Court property was not expected to end on the basis of a handshake or a verbal utterance by the Trustees to the realtor. This case is unlike *McBarron*, in which the negotiations were entirely oral, with the deal consummated over the telephone followed by repeated verbal confirmations by the seller that the deal was done and would be honored. *See McBarron, supra*, 365 *N.J.Super.* at 118, 838 *A.2d* 490.

In conclusion, we are satisfied, even when viewing the evidence in the light most favorable to plaintiff, that there was neither a

written nor oral contract for the sale of the Orchard Court property.

## III.

We hold that summary judgment was properly granted and affirm the judgment of the Appellate Division dismissing the complaint.

*For affirmance*—Chief Justice PORITZ and Justices LONG, VERNIERO, LaVECCHIA, ZAZZALI, ALBIN and WALLACE—7.

*Opposed*—None.