**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT

———

No. 10-4417

———

BARBARA HOUSTON,
                                        Appellant

v.

JOHN R. HOUSTON, III; WEST AND FEINBERG P.C.; WHITNEY HOUSTON

———

Appeal from the United States District Court for the District of New Jersey
(No. 2:08-cv-5530 (PGS))
District Judge: Honorable Peter G. Sheridan

———

Submitted under Third Circuit LAR 34.1(a)
November 18, 2011

———

Before: FUENTES and CHAGARES, <u>Circuit Judges</u>
and POGUE,* <u>Judge</u>

(Opinion Filed: December 1, 2011   )

———

OPINION

———

---

* Hon. Donald C. Pogue, Chief Judge, United States Court of International Trade, sitting by designation.

POGUE, Judge,

Appellant Barbara Houston appeals the District Court's grant of summary judgment in a suit arising out of a family dispute over an alleged contract for payment of proceeds of a life insurance policy to satisfy a mortgage debt on Appellant's New Jersey residence ("residence"). The two questions at issue are whether the Statute of Frauds applies to the alleged contract, and if so, whether there is sufficient evidence to support the inference that the parties had an oral agreement. For the reasons discussed below, we affirm the District Court's decision.

## I. BACKGROUND

Because we write primarily for the benefit of the parties, we recount only the critical facts. Appellant is the step-mother of Appellee, Whitney Houston, and the widow of John R. Houston Jr. ("John Houston"), who is the Appellee's late father. The mortgage debt was created when, in 1990, Appellee loaned John Houston the funds to purchase the residence. The mortgage note was for a principal amount of $723,800.00. James P. Cinque, formerly an attorney for the Appellee, prepared the mortgage. John Houston was to make installment payments on the mortgage, and the mortgage contract provided for default payments and penalties. By the time of his death in February 2003, John Houston was in default on these payments.

Appellee (in the form of Nippy, Inc.[1]) also purchased an insurance policy, in the

---

[1] Appellee was the sole shareholder in Nippy, Inc.

amount of $1,000,000, on her father's life. Various documents relating to the insurance policy were drafted, but none of them were ever signed during the many years between the purchase of the policy and John Houston's death. At his death, John Houston bequeathed all of his assets to Appellant, and Appellee received the insurance proceeds. Appellee did not, however, apply the insurance proceeds to the mortgage.[2] In addition, when John Houston's estate was probated Appellee did not object, in probate, to the transfer of the residence to the Appellant. The mortgage debt at the time of John Houston's death was approximately $1.15 million, and at the time of Appellant's filing this action it had increased to $1.4 million.

Appellant filed a complaint in state court on May 9, 2008, alleging that Appellee illegally kept insurance proceeds from a policy she created for her father and that she failed to honor an agreement with her father to apply those proceeds to the mortgage debt on the residence that Appellant received from John Houston's estate. Appellee removed the action to federal court on November 11, 2008. The District Court granted summary judgment in Appellee's favor on October 20, 2010.

## II. JURISDICTION & STANDARD OF REVIEW

We have appellate jurisdiction over the matter under 28 U.S.C. § 1291 and review *de novo* whether the District Court's grant of summary judgment was appropriate. Kopec

---

[2] After John Houston's death, the $1,000,000 life insurance policy was "inexplicably" credited against the mortgage debt. At deposition, the accountant recalled that those were Appellee's instructions, but he never recalled hearing of an agreement. The court infers, from the fact that there is a dispute in this case, that Appellee ultimately received this money.

v. Tate, 361 F.3d 772, 775 (3d Cir. 2004). Construing the facts in the light most favorable to the Appellant, we consider whether there is a genuine dispute regarding any material fact. Id.; Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 255 (1986).

## III. ANALYSIS

### A. Statute of Frauds

Under the Statute of Frauds ("SOF"),[3] "a transfer of real estate" must be in writing. N.J. STAT. ANN. § 25: 1-13 (West 2011); see also id. at § 1-10.[4] There is, however, an

---

[3]
>    a. A transaction intended to transfer an interest in real estate shall not be effective to transfer ownership of the interest unless:
>
>    (1) a description of the real estate sufficient to identify it, the nature of the interest, the fact of the transfer and the identity of the transferor and the transferee are established in a writing signed by or on behalf of the transferor; or
>
>    (2) the transferor has placed the transferee in possession of the real estate as a result of the transaction and the transferee has paid all or part of the consideration for the transfer or has reasonably relied on the effectiveness of the transfer to the transferee's detriment.
>
>    b. A transaction which does not satisfy the requirements of this section shall not be enforceable except as an agreement to transfer an interest in real estate under section 4 of this act.
>
>    c. This section shall not apply to leases.
>
>    d. This section shall not apply to the creation of easements by prescription or implication.

N.J. STAT. ANN. § 25:1-11 (internal citations omitted).

[4]
>    "Interest in real estate" means any right, title or estate in real estate, and shall include a lease of real estate, a lien on real estate, a profit, an easement, an interest in a trust in real estate and a share in a cooperative

4

exception to the "in writing" requirement if the terms of an oral agreement can be proven by "clear and convincing evidence." Id. at § 1-13(b).[5]

Appellant argues that the SOF does not apply here because John Houston and Appellee's agents had an oral agreement to use the insurance proceeds to reduce the balance of the mortgage on the residence rather than to transfer an interest in the real estate itself. To the Appellant, under the SOF, only a discharge of the mortgage is required to be in writing. In other words, Appellant contends that the transfer of funds at issue is not covered by the SOF. Appellant calls this transaction a "reduction" of the balance on a mortgage, which does not "extinguish" the lien on the property and is thus not a transfer of real estate under the SOF.

As the District Court correctly concluded, however, the SOF applies to a transfer

---

apartment.

"Transfer of an interest in real estate" means the sale, gift, creation or extinguishment of an interest in real estate.

N.J. STAT. ANN. § 25: 1-10.

[5]

[W]hen an agreement has not been reduced to writing, a "high standard of proof" must be met to establish that intent. Specifically, "the existence of an [oral] agreement between the parties as well as its essential terms must be proved by clear and convincing evidence." The Commission stated that, "[t]he circumstances surrounding a transaction, the nature of the transaction, the relationship between the parties, [and] their contemporaneous statements and prior dealings, if any, all are relevant to a determination of whether the parties made an agreement by which they intend to be bound." Morton v. 4 Orchard Land Trust, 849 A.2d 164, 168 (N.J. 2004) (internal citations omitted).

of real estate; including, but not limited to, an extinguishment.[6]   An extinguishment of a lien is a lien's discharge by legal operation. Black's Law Dictionary 664 (9th ed. 2009). As the District Court noted, the alleged agreement to pay off the mortgage with the insurance proceeds is akin to an extinguishment of Appellee's mortgage, and thus is subject to the SOF.  Absent evidence or language suggesting otherwise, the alleged agreement to use the insurance proceeds to pay off the mortgage would have extinguished Appellee's mortgage.[7]

The parties agree that while there is evidence of drafts of agreements, emails and other documents which were produced during discovery, there is no evidence of a signed agreement between John Houston and Appellee stipulating that the life insurance proceeds be used to reduce the mortgage.  Therefore, because the SOF requires that, unless there is "clear and convincing evidence" of an oral agreement, an instrument must be signed and in writing in order to create a binding promise or agreement, it follows that we must determine whether there is evidence sufficient to create an issue of material fact of the existence of an oral agreement.

## B.  Oral Agreement

Clear and convincing evidence is somewhere between a preponderance of the

---

[6] See supra note 4.

[7] The District Court also correctly suggests that even if the SOF did not apply, then Appellant would still have to prove by a preponderance of the evidence that there was a breach of the contract or past performance on the contract.   However, as discussed below, none of the "agents" providing information for the record recall any such agreement.

evidence and "beyond a reasonable doubt." e.g., <u>Aiello v. Knoll Golf Club</u>, 165 A.2d 531, 534 (N.J. Super. Ct. App. Div. 1960).  We agree with the District Court that the evidence in the record here would not permit a reasonable mind to conclude (or be convinced) that the existence of an oral argument was clear.  The test is whether there was sufficient evidence of a "meeting of the minds" to form an agreement. <u>Morton</u>, 849 A.2d at 165.

Appellant argues that the record, including drafts and letters regarding the mortgage, supports her claim that the insurance proceeds were intended to pay off the balance of the mortgage upon John Houston's death.  Appellant submits numerous documents and correspondence between various of Appellee's employees regarding the alleged contract.  According to Appellant, those letters and emails show that Appellee bought the insurance in order to pay for the mortgage debt, and that the parties and their agents intended to agree to a binding contract to that end.

On the other hand, Appellee contends that no such agreement exists and that she never even discussed the issue with her father.  She notes that a 1999 re-certification of the insurance policy involved no modifications or contingencies, and preserved her status as the sole beneficiary.  Additionally, Appellee notes that the documents in the record confirm that a writing was required to change the policy, and that none of the drafts were ever signed.  Notably, at the time of deposition, neither Appellee nor any of her agents

could recollect an agreement.[8]

The parties both focus on a 1991 letter from James Cinque to Appellee's former accountant, Robert Ryder. The letter indicated Appellee's agreement to apply the insurance proceeds to the mortgage balance due, but the letter was not signed. Both Cinque and Ryder testified to a lack of knowledge about that agreement. Similarly, throughout the record, there was discussion regarding the policy, the mortgage, and the potential application of the insurance proceeds to the mortgage, but there is no actual signature by either party and no tangible proof of the parties' intent.

Thus, while drafts of an agreement exist, there was also a period of many years during which the parties had ample opportunity to sign the agreement, but did not do so. While the father-daughter relationship might suggest a casual relationship regarding finances, it can also suggest that if there had been an intent to complete the agreement, it would have been by a writing, as proposed by the attorneys and other agents. See Morton, 849 A.2d at 168 (noting that the "relationship between the parties" is relevant to determining "whether the parties made an agreement by which they intend to be bound."). Nonetheless, anticipation of a written agreement does not preclude a finding of an oral agreement if the parties' intent to be bound is clear. McBarron v. Kipling Woods L.L.C., 838 A.2d 490, 491 (N.J. Super. Ct. App. Div. 2004).

---

[8] The District Court also mentioned that the "Korf letter" indicated that John Houston knew that an agreement was necessary, but he still never signed any agreement during a period of over a decade.

Therefore, the court must decide whether there is sufficient evidence of the parties' intent to be bound by an oral agreement. <u>Morton</u>, 849 A.2d at 170-71.  Both past dealings and the relationship of the parties can dictate such an intent to agree.  <u>Morton</u>, 849 A.2d at 168-69.  Appellee denies any such intent, while Appellant suggests that the intent to agree should be inferred because it would be the norm for family members to conduct business in a less formal manner than if they were unrelated.  It remains the case, however, that there is no tangible evidence that Appellee intended to finalize an agreement with her father, much less that she came to an oral agreement with him to do so.

## IV. CONCLUSION

Accordingly, we will affirm the judgment of the District Court.